# United States Court of Appeals
## For the First Circuit

Nos. 07-1205
     07-1398

UNITED STATES OF AMERICA,

Appellee,

v.

RENÉ VÁZQUEZ-BOTET, M.D. and
MARCOS MORELL-CORRADA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Circuit Judge,
and Selya, Senior Circuit Judge.

Scott A. Srebnick, with whom Howard M. Srebnick and Black, Srebnick, Kornspan & Stumpf. P.A., was on brief for appellant Vázquez-Botet.
     Rafael F. Castro-Lang, for appellant Morell-Corrada.
     Peter W. Miller, with whom Stuart A. Weinstein-Bacal, José A. Cabiya-Morales, and Weinstein-Bacal & Miller, P.S.C., was on brief for amicus curiae Caribbean International News, Inc. d/b/a El Vocero, Santa Rita Acquisitions Corp. d/b/a The San Juan Star, Wilfredo G. Blanco-Pi d/b/a Wapa Radio, and Madifide, Inc. d/b/a Notiuno 630.
     Mary K. Butler, Trial Attorney, Public Integrity Section, Criminal Division, U.S. Department of Justice, with whom William M.

Welch, II, Chief, was on brief for appellee.

Efrem M. Grail, with whom Reed Smith LLP, Thomas J. Farrell, and Dreier LLP, was on brief for intervenors Dick Corporation and Dan Martin.

––––––––––––––––––

July 9, 2008

––––––––––––––––––

**TORRUELLA**, **Circuit Judge**. René Vázquez-Botet ("Vázquez") and Marcos Morell-Corrada ("Morell") were convicted of conspiracy, extortion, and mail and wire fraud for their roles in demanding money from construction contractors in exchange for using their influence in the Puerto Rico government to secure them a major project. On appeal, the defendants claim that the district court committed a myriad of errors invalidating their convictions; alternatively, they claim errors requiring remand for resentencing. After careful consideration of each of these arguments in light of the record, we affirm both defendants' convictions and sentences.

## I. Background

Because Morell challenges the sufficiency of the evidence supporting his conviction, we relate the facts "as the jury could have found them, drawing all inferences in the light most consistent with the jury's verdict." United States v. Colón-Díaz, 521 F.3d 29, 32 (1st Cir. 2008) (citation and internal quotation marks omitted). We consider only those facts relevant to the issues on appeal. In August 1994, the Puerto Rico Aqueduct and Sewer Authority ("PRASA") solicited bids from construction contractors to build a large water pipe -- dubbed the "Superaqueduct" -- along Puerto Rico's north coast. The magnitude of the project required the bidding contractors to form consortia with local subcontractors for the provision of equipment, expertise, financial resources, and labor. One of the aspirants

was a consortium led by contractor Thames-Dick, a joint venture between a British firm and the Dick Corporation of Pennsylvania. Within the Thames-Dick consortium were a number of Puerto Rico subcontractors: (1) Las Piedras Construction, owned by Pedro "Cuco" Feliciano; (2) Constructora Hato Rey, owned by Waldemar Camrona; (3) Longo de Puerto Rico, owned by Greg Laracy; (4) Carrero Engineering, owned by Alberto "Tico" Carrero; and (5) Cobián, Agustín & Ramos, controlled by José Cobián-Guzmán ("Cobián"). Thames-Dick won the $305 million contract in January 1996; it began construction in September 1996 and finished in 2000.

Cobián, a key government witness, testified at trial that he knew from experience that, in order for his consortium to be awarded the contract, he would need to bribe someone influential in the government, which at the time was controlled by the New Progressive Party ("NPP"). Thus, in June 1995, Cobián approached Vázquez, an ophthalmologist and the manager of Governor Pedro Rosselló's reelection campaign. Several witnesses testified that Vázquez was believed to hold an almost unparalleled degree of sway within the Rosselló government. Vázquez told Cobián that he would do what he could in exchange for two percent of the total value of the contracts awarded to the Thames-Dick subcontractors. Cobián explained that the subcontractors' share of the total would be more than $200 million; two percent was estimated to be about $2.4 million. Vázquez indicated that Morell, an attorney and NPP

Secretary-General, and José Granados-Navedo ("Granados"), the NPP chair of the House of Representatives infrastructure committee, would be assisting him and would need a share of the $2 million. Cobián proposed that it be split four ways, with him receiving a quarter; Vázquez acquiesced. Vázquez said he would deal only with Cobián and must be paid in cash, and that Cobián should approach Morell and Granados directly to arrange their payments. Vázquez did not explain to Cobián what actions he or others would take to make sure Thames-Dick got the contract.

Cobián then went to subcontractors Feliciano, Carmona, Laracy, and Carrero and told them that together they would have to pay two percent of their part of the contract award to purchase the assistance of influential people in the government. Although the subcontractors had not delegated authority to Cobián to make such a deal on their behalf, they grudgingly agreed to pay.

The subcontractors paid Cobián incrementally as they received payments from Thames-Dick. They understood that Cobián would then pass the payments on to the politicians in question. Cobián delivered monthly cash payments to Vázquez in his office, and made other payments to third parties for NPP campaign expenses owed them by Vázquez. On one occasion Feliciano, who had figured out that Vázquez was one of the recipients of the extortionate payments, made a $5,760 payment to him in person at his medical office.

On Vázquez's instructions, Cobián went to Morell's law office to arrange how his payments would be made. Morell drew up a sham contract under which Cobián was to pay Morell's law firm $5,000 per month for legal services; Cobián made these monthly payments from 1997 to 1999. In addition, Morell and Cobián arranged for Cobián to make several payments to third parties (including Sears, a rental car company, an architectural firm, and a basketball team) on Morell's behalf. Morell never actually performed any legal services for Cobián or his company. Cobián similarly made payments to third parties on Granados's behalf, and also made some cash payments to Granados.

In all, the subcontractors gave Cobián cash and checks totaling over $1 million; of this, Vázquez received the equivalent of over $360,000, and Morell received over $125,000. Vázquez failed to report to the Puerto Rico Treasury Department the money he received from Cobián from 1997 to 1999, and concealed thousands more dollars of cash payments made to him by his ophthalmology patients and businesses involved in healthcare services. Morell reported on his tax returns payments to his law firm by Cobián in 1997 and 1998 under the sham contract. Morell failed to report the approximately $25,000 paid in 1999 and the many third-party payments made by Cobián, which totaled some $23,000; he also failed to report payments from other clients in 1998 totaling about $22,000.

In July 1999, when Cobián learned that he had been indicted for unrelated conduct, he panicked and stopped making payments to Vázquez, Morell, and Granados. After pleading guilty to the indictment, Cobián decided to cooperate with the Government in exchange for immunity with respect to further crimes for which he might implicate himself in rendering such cooperation, and the Government's recommendation of a sentencing reduction. Cobián then told investigators of the details of the Superaqueduct extortion scheme. On the basis of this and other information, the Government sought indictments against Vázquez, Morell, and Granados.

On April 8, 2004, a grand jury returned a public indictment charging Vázquez and Morell with the following: (1) one count of conspiracy to commit extortion and launder money in furtherance of a bribery scheme, in violation of 18 U.S.C. § 371; (2) several counts of extortion under color of official right and by economic fear, in violation of the Hobbs Act, 18 U.S.C. § 1951, and aiding and abetting this offense under 18 U.S.C. § 2; and (3) several counts of mail and wire fraud committed as part of a scheme to defraud Puerto Rico of income tax payments, in violation of 18 U.S.C. §§ 2, 1341, and 1343.[1] The Government's central theory was that the defendants and Granados conspired to induce the subcontractors to pay them a portion of their Superaqueduct profits

---

[1] Morell was also charged with obstruction of justice under 18 U.S.C. § 1503 but was acquitted on this count, and this charge is not at issue in this appeal.

by making them fear that if they did not pay (and keep making periodic payments), the defendants and Granados would use their influence in the government:  (1) to promote the subcontractors' competitors for the bid; (2) to remove the subcontractors from the contract after it was already awarded; or (3) would malign their professional reputations so that their respective businesses would not receive government contracts in the future.

After we ordered the recusal of the original trial judge from this case, see In re United States, 441 F.3d 44, 49 (1st Cir. 2006), the case was randomly reassigned to Chief Judge Fusté. Vázquez moved to recuse Chief Judge Fusté on a number of grounds, and Chief Judge Fusté denied the motion, United States v. Vázquez-Botet, 453 F. Supp. 2d 362, 374 (D.P.R. 2006).  We denied mandamus relief, noting that Vázquez could challenge the non-recusal on end-of-case appeal if he were found guilty.  In re Vázquez-Botet, 464 F.3d 54, 57 (1st Cir. 2006) (per curiam) ("Vázquez-Botet I") (facts presented by Vázquez did not present the "'clear and indisputable'" right to immediate mandamus relief necessary for such an extraordinary remedy (quoting In re Cargill, Inc., 66 F.3d 1256, 1262 (1st Cir. 1995))).  Vázquez now avails himself of the opportunity to appeal the non-recusal.

Before trial, the then-lead prosecutor of the U.S. Attorney's Office in Puerto Rico granted several of the subcontractors immunity from prosecution in exchange for their

-8-

testimony. Cobián also testified with immunity under the prior agreement, and Granados pled guilty to crimes committed in carrying out his role in the extortion scheme and also testified for the Government. During the pretrial phase, responsibility for the prosecution of the case was transferred from the U.S. Attorney's Office in Puerto Rico to the Public Integrity Section of the Department of Justice in Washington, D.C.

On September 25, 2006 -- the day before trial was set to begin and more than two years after he was indicted -- Vázquez subpoenaed two witnesses, hereinafter "Witness A" and "Witness B," to compel their testimony at trial; he also served a subpoena on Dick Corporation for the production of certain documents. Witness A was a Dick Corporation official and Witness B was a consultant hired by Dick Corporation to conduct marketing activities inside and outside Puerto Rico, including negotiations for the construction of "intercity connectors" -- pipelines connecting the Superaqueduct to municipal water systems.[2] Vázquez sought to argue at trial, inter alia, that it was Witness B, another consultant ("Consultant C"), and powerful persons for whom they worked who extorted money from the subcontractors in exchange for the Superaqueduct contract, and not Vázquez. The Government, Dick Corporation, and Witness B opposed the subpoenas. The

---

[2]  The indictment against Vázquez and Morell did not allege any corruption or extortion with respect to the intercity connectors.

district court ruled the proposed evidence irrelevant in light of the uncontradicted statements of Witnesses A and B to investigators that any relationship between Witness B and Dick Corporation began at least two years after the Superaqueduct project had been awarded. But the court stated that it would allow the defendants to make an offer of proof nonetheless, in order to create a record of its relevancy decision for appellate review.

Accordingly, on October 16, 2006, the district court held a hearing at which Vázquez questioned Witnesses A and B and the Government cross-examined Witness A.[3] The court closed the hearing to the press and public to preclude what it feared would be a "sideshow"; the court clarified that "[t]his is not part of the trial. This is a hearing to determine relevancy." Both witnesses testified that Witness B and Consultant C did not represent Dick Corporation in its efforts to obtain the Superaqueduct contract for the Thames-Dick consortium. They also testified that Dick Corporation did not even hire Witness B until 1998 or 1999 -- at least two years after the awarding of the contract when the project was nearing completion -- and hired Consultant C sometime thereafter. Witnesses A and B also testified that, to the extent that the tasks Witness B performed on behalf of Thames-Dick had anything to do with the Superaqueduct project, they were confined to negotiations surrounding the intercity connectors.

---

[3] The Government chose not to cross-examine Witness B.

On October 19, 2006, the district court issued a sealed order confirming its earlier relevancy ruling and quashing both subpoenas. The court took account of documents submitted by Dick Corporation and the witnesses' testimony to confirm its pre-hearing assessment with respect to Witness B: the proposed evidence was irrelevant to any triable issue or defense, as the contractual relationship between Witness B and Dick Corporation began more than two years after the events giving rise to the accusations against Vázquez; allowing testimony on this relationship would "result in unnecessary and irrelevant distractions." With respect to Witness A, the court found that he had no evidence to offer that would tend to prove or disprove Vázquez's link to any wrongdoing, save possible knowledge of two discrete events on which the defendants should be permitted to question Witness A at trial; the defendants did not ultimately avail themselves of this opportunity and Witness A never appeared at trial. The district court maintained the seal on all written and oral arguments in the litigation surrounding the quashed subpoenas, and ordered that any public dissemination of the hearing transcript or the exhibits proffered at the hearing would result in "severe penalties by contempt or otherwise." The court denied Vázquez's post-trial motion to unseal this portion of the record. Vázquez and Morell now argue before us that these decisions effected a violation of

their Sixth Amendment right to a fair trial, compelling us to vacate their convictions.

Trial began on September 26, 2006. Among others, Feliciano, Carmona, Cobián, and Granados testified as government witnesses. Among many other things, Cobián testified on direct that Vázquez told him Morell would be among those helping Thames-Dick to secure the Superaqueduct contract. Morell objected to this testimony as hearsay not covered by the coconspirator exemption in Federal Rule of Evidence 801(d)(2)(E). The district court provisionally allowed the testimony and later confirmed the applicability of Rule 801(d)(2)(E) and kept the testimony on the record. Morell now claims this ruling constituted reversible error.

The Government also called the co-case agent, Federal Bureau of Investigation ("FBI") special agent Ivan Vitousek. Vitousek testified about a number of FBI investigatory practices, including that of using cooperators in public corruption cases. In the course of direct and cross-examination, Vitousek made several statements that the defendants characterized as improper bolstering of the credibility of other government witnesses. Vázquez and Morell argue on appeal that Vitousek's vouching made the jury more likely to believe these witnesses, thus prejudicing the outcome of the trial to their detriment. During closing arguments, the prosecutor made a number of statements the defendants now brand as

prosecutorial misconduct mandating retrial. We discuss all these challenges in greater detail below.

On November 3, 2006, the jury convicted Vázquez and Morell on the conspiracy count, on several of the extortion counts, and on several of the mail and wire fraud counts. On January 30, 2007, the district court sentenced Vázquez and Morell each to five years' imprisonment, and a $100,000 fine. The court determined their respective guideline Sentencing ranges ("GSRs") by looking at the total amount of profit earned by the subcontractors -- some $10 million. On appeal, both defendants challenge the propriety of this methodology.

## II. Discussion

### A. Chief Judge Fusté's Non-Recusal

Before trial, Vázquez moved for Chief Judge Fusté to recuse himself, claiming recusal was required for a number of reasons. Chief Judge Fusté denied the motion, Vázquez-Botet, 453 F. Supp. 2d at 374, and Vázquez petitioned us for mandamus relief, which we denied, Vázquez-Botet I, 464 F.3d at 57. On appeal, Vázquez renews his claim that Chief Judge Fusté should have been recused, but narrows the focus to two arguments. We address these in turn. We will sustain Chief Judge Fusté's decision not to recuse himself unless we find that it "cannot be defended as a rational conclusion supported by [a] reasonable reading of the record."

-13-

United States v. Snyder, 235 F.3d 42, 46 (1st Cir. 2000) (quoting In re United States, 158 F.3d 26, 30 (1st Cir. 1998)).

Vázquez first questions Chief Judge Fusté's partiality because of the professional activities of the judge's wife, an attorney named Rachel Brill, in matters tangentially related to this case. Specifically, Brill represented subcontractor Laracy during several meetings between Laracy and the Government, negotiated the agreement that provided Laracy with immunity in exchange for his grand jury and trial testimony in this case, and represented him when he testified before the grand jury that indicted Vázquez. Brill also represented José Ventura, another local contractor not involved in the events at issue here. During this representation, Brill filed a public motion in the district court (presided over by a different judge) in which she requested sanctions against Vázquez's lawyer for attempting to intimidate Ventura. After Vázquez had been indicted, Brill sent a letter to Vázquez's lawyers accusing Vázquez of trying to extort money out of Ventura by falsely accusing Ventura of slander; Brill copied this letter to the prosecutors in this case so they could investigate whether Vázquez had thereby violated his bail conditions.

Vázquez argues that Chief Judge Fusté's decision not to recuse himself in light of his wife's activities constitutes reversible error under 28 U.S.C. § 455(b)(5)(ii) (judge shall disqualify himself if spouse "[i]s acting as a lawyer in the

-14-

proceeding"); see also id. § 455(d)(1) ("'[P]roceeding' includes pretrial, trial, appellate review, or other stages of litigation."). We disagree. As we noted in Vázquez-Botet I, "while an attorney need not be 'enrolled as counsel' of record in order to fall within [§ 455(b)(5)(ii)], the attorney must at least 'actually participate in the case.'" 464 F.3d at 58 (quoting McCuin v. Tex. Power & Light Co., 714 F.2d 1255, 1260 (5th Cir. 1983)) (citations and alteration omitted); accord United States ex rel. Weinberger v. Equifax, Inc., 557 F.2d 456, 463-64 (5th Cir. 1977) (recusal required where judge's family member actively participates). Chief Judge Fusté has issued a standing order that Brill not appear as an attorney in any proceeding before him. In line with this directive, Brill did not appear before him in this case, as counsel for Ventura, Laracy, or anyone else.

Specifically with respect to Brill's representation of Ventura, it is clear that neither of the incidents impugned by Vázquez counts as "actually participat[ing] in th[is] case." Vázquez-Botet I, 464 F.3d at 58. Brill's motion requesting sanctions against Vázquez's lawyer on Ventura's behalf occurred before Vázquez was even indicted. We reaffirm our observation in Vázquez-Botet I that this action thus fell outside the scope of "pretrial, trial, appellate review, or other stages of litigation." 464 F.3d at 58 (quoting 28 U.S.C. § 455(d)(1)). In Vázquez-Botet I, we likewise rejected Vázquez's other contention relating to Ventura:

-15-

that Brill's post-indictment letter to Vázquez's lawyers, copied to the prosecutor in this case, somehow converted her into a lawyer acting in this proceeding. Id. at 59. Brill sent this letter in response to a communication from Vázquez directly to Ventura seeking $10 million for allegedly slandering him during testimony in other judicial and legislative proceedings. In her letter, Brill cited a statutory privilege for Ventura's testimony and characterized Vázquez's demand as "laughable." However, while she remarked that Vázquez's demand may also have been extortionate, she did not accuse him of extortion outright. And the prosecutor did not act on the letter by, for example, requesting sanctions against Vázquez for violating his bail conditions, adding charges against him in this case, or issuing a separate indictment for attempting to extort money out of Ventura. Moreover, Brill made no submissions before the district court in this case requesting action against Vázquez; no party sought introduction of Brill's letter into evidence or made any reference to it; and Ventura was not called to testify. These considerations lead us readily to conclude, as we did in Vázquez-Botet I, that any connection between Brill's letter and the events in this case was simply too tangential to qualify her as a lawyer acting in the proceeding.

As for Laracy, while he did testify at trial, he was not represented by Brill at the time.[4]  Brill's representation in the negotiations for Laracy's immunity agreement occurred more than ten months prior to Vázquez's indictment, and Brill was not mentioned at any point during the trial.  Thus, as we held in Vázquez-Botet I, Brill's representation did not constitute acting in this proceeding. 464 F.3d at 58.  We also expressed doubts in Vázquez-Botet I that her representation of Laracy during his grand jury testimony could be considered part of this proceeding because the grand jury is functionally and constitutionally separate from the district court. Id. at 58 n.6 (citing In re United States, 441 F.3d at 57).  Today we confirm our formerly expressed views and hold that, for purposes of the recusal statute, the grand jury hearing was separate from pretrial and trial proceedings in the district court.

Vázquez bases his second challenge to Chief Judge Fusté's impartiality on the more general language of 28 U.S.C. § 455(a), which requires recusal where the judge's "impartiality might reasonably be questioned."  Vázquez argues that a reasonable and informed member of the public could fairly conclude that Chief Judge Fusté was biased against him because Brill openly took sides in this litigation by asking another judge to sanction Vázquez's lawyer; moreover, as a conjugal partnership under Puerto Rico law, Chief

---

[4]  It is unclear from the record whether Laracy was accompanied by any lawyer when he gave this testimony.

-17-

Judge Fusté and Brill necessarily shared in the legal fees paid the latter by Laracy, and the public surely believes the two talk about their work in private. These arguments are unavailing.

Section 455(a) requires us to examine whether a reasonable observer, knowing all the relevant facts, would have doubts about Chief Judge Fusté's impartiality in this proceeding. Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 860-61 (1988). Vázquez's speculative arguments assume that Brill played a much more significant role than she actually did. Critically, Brill's involvement in this case and in other matters tangentially implicating Vázquez occurred more than two years before Chief Judge Fusté was randomly assigned to replace the original district judge. To that end, Vázquez provides no explanation as to how Brill's fees could possibly have biased Chief Judge Fusté against Vázquez or adversely affected any of his rulings. Furthermore, no reasonable observer would interpret Brill's advocacy on behalf of Ventura as evincing some sort of personal animosity toward Vázquez that somehow endured through pretrial and trial proceedings and prompted her to disparage him in front of her husband.

For these reasons, we cannot say that Chief Judge Fusté's decision not to recuse himself was irrational or lacked support on a reasonable reading of the record. Snyder, 235 F.3d at 46. As such, we dismiss this ground of appeal and proceed to the next one.

##### B.   The Closed Relevancy Hearing

Vázquez and Morell argue that the October 16, 2006 closed hearing violated their Sixth Amendment rights to a public trial and to present evidence in their own defense.  See Waller v. Georgia, 467 U.S. 39, 47 (1984); In re Oliver, 333 U.S. 257, 273 (1948).  The defendants argue that these errors were structural and we must, therefore, vacate their convictions.  See Owens v. United States, 483 F.3d 48, 64 (1st Cir. 2007).  We allowed two Puerto Rico newspapers and two radio stations to appear jointly as amici curiae.[5]  In their brief and in oral arguments before us, the amici joined the defendants in objecting to the October 16 hearing, but on a new ground:  that the hearing's closure and the sealing of related documentation violated the press and public's First Amendment right of access to criminal proceedings.  See Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596, 603 (1982).  The Government counters that, as explicitly noted by the district court, this particular hearing was merely an offer of proof to preserve the court's relevancy determination, and that neither the defendants' Sixth Amendment rights nor the press and public's First Amendment rights were implicated.[6]  Under the

---

[5]   The amici point out that this case has received high media attention in Puerto Rico due to the defendants' notoriety and letters to newspapers written by Vázquez professing that what was discussed at the October 16 hearing exonerates him.

[6]   The Government also asserts that the press may not raise a First Amendment argument not raised by one of the parties.

-19-

circumstances, the Government is correct on the first point; we need not reach the merits of the second.

Vázquez proffered the testimony of Witness A and Witness B and the subpoenaed Dick Corporation documents in an attempt to show that Witness B, Consultant C, and powerful persons for whom they worked were the ones who extorted money out of the subcontractors in exchange for the Superaqueduct contract, and that the defendants were framed in order to throw suspicion off of these and other implicated individuals. After considering the testimony of Witness A and Witness B from the October 16 hearing, the district court confirmed its earlier ruling that the evidence was mostly irrelevant to any matter at issue in the trial of Vázquez and Morell. The court focused primarily on the timeline of the contractual relationship between Witness B and Dick Corporation. Witness A and Witness B indicated that Witness B began working informally on behalf of Dick Corporation sometime in 1998, as a consultant and marketing agent for the company in several construction projects in Puerto Rico and elsewhere. This relationship was formalized in a written contract in the fall of 1999, and Consultant C was hired at around the same time. The witnesses also testified that Witness B and Consultant C had nothing to do with the 1995-96 discussions surrounding the Superaqueduct bid. The district court also examined documents submitted by Dick Corporation, which confirmed that the contractual relationship between Witness B and Dick Corporation

began well after the bid was awarded, and opined that Vázquez's subpoena to Dick Corporation "was a broad, sweeping fishing expedition." The court concluded that Vázquez's theory that Witness B was involved in the Superaqueduct extortion scheme was unfounded speculation and that any evidence Witness B could provide at trial would be irrelevant, and accordingly quashed Vázquez's subpoenas to Witness B and Dick Corporation.[7] The court ordered that the transcript of the October 16 hearing and the proffered exhibits remain sealed, and warned that their divulgence would be punished by contempt.

We first address the defendants' contention that the district court's relevancy ruling deprived them of an opportunity to present exonerating evidence to the jury, and thus violated their Sixth Amendment right to defend themselves. We afford the district court considerable discretion in making relevancy determinations and in excluding evidence for lack of relevance, and our review of such determinations is for abuse of discretion. Richards v. Relentless, Inc., 341 F.3d 35, 49 (1st Cir. 2003).

---

[7] The court found Witness A's proposed testimony minimally relevant with respect to "two very discrete areas," and left the subpoena intact insofar as the defendants wished to ask him questions only in relation to these areas. These areas had no bearing on whether someone other than Vázquez, Morell, and Granados was extorting money from the subcontractors. The defendants' decision not to call Witness A at trial waives any objection regarding that potential testimony.

After examining the October 16 hearing transcript, the documents provided by Dick Corporation, and the submissions of the parties, we agree with the district court that the proposed evidence was irrelevant to any issue in the prosecution of Vázquez and Morell; we also agree that to place such evidence in front of the jury would have resulted in a confusing and distracting sideshow. Nothing in the transcript, the Dick Corporation documents submitted at the hearing, or the sealed written submissions contains any suggestion that Witness B or Consultant C was connected in any way to the Superaqueduct project until at least 1998, and then only tangentially with respect to the intercity connectors, which involved a completely separate contract. Moreover, nothing in the record reveals that either individual was involved in any scheme to extort money from the subcontractors. The conduct the jury found to be extortionate began in June 1995, when Vázquez told Cobián that he, Morell, and Granados would use their influence to help Thames-Dick win the contract in exchange for money. While the effects of this conduct -- including the subcontractors' monthly payments to the defendants and Granados -- continued for several years and partially overlapped in time with Witness B's and Consultant C's employment at Dick Corporation, the main criminal act was accomplished long before these two persons appeared on the scene. Indeed, Witness B testified that he had no contact at all with the individual subcontractors with the exception of Carrero, with whom

he had a social relationship and worked on matters unrelated to the Superaqueduct. Witness B's testimony also indicates that his contacts with persons in the Rosselló government were minimal and his influence over them virtually nil.

The district court did not, therefore, abuse its discretion in deeming the proposed evidence irrelevant and excluding it from the trial. See Achille Bayart & Cie v. Crowe, 238 F.3d 44, 49 (1st Cir. 2001); cf. United States v. Nivica, 887 F.2d 1110, 1118 (1st Cir. 1989) (affirming district court's denial of subpoenas for three proposed defense witnesses where the anticipated testimony would have been irrelevant, in part because the witnesses' involvement with the defendant occurred subsequent to his criminal conduct). This conclusion disposes of the defendants' claim that the district court violated their Sixth Amendment right to present a defense, as no such right exists where the evidence proffered has been properly ruled irrelevant. See United States v. Maxwell, 254 F.3d 21, 26 (1st Cir. 2001) (defendant's "wide-ranging right to present a defense" still "does not give him a right to present irrelevant evidence") (citing In re Oliver, 333 U.S. at 273-74 & n.31); United States v. Reeder, 170 F.3d 93, 108 (1st Cir. 1999) (no "'unfettered'" Sixth Amendment right "'to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence'" (quoting Montana v. Egelhoff, 518 U.S. 37, 42 (1996))).

We therefore turn to the defendants' remaining argument concerning the October 16 hearing: that the closure of the hearing and sealing of related documentation violated their Sixth Amendment right to a public trial. Our review of this (preserved) claim is plenary. See United States v. DeLuca, 137 F.3d 24, 33 (1st Cir. 1998). Despite the defendants' sweeping assertions regarding the scope of the public-trial right, the question before us is quite narrow. We think it clear that, as characterized by the district court, the October 16 hearing was not a trial session, but rather a "question-and-answer" offer of proof,[8] the purpose of which was to create a record so that we could determine the propriety of the court's relevancy ruling.[9] See Wright & Graham, Federal Practice and Procedure § 5040.3, at 908 (2d ed. 2005) (in question-and-answer offer of proof, proponent elicits proposed testimony by questioning witness outside jury's presence); accord United States v. Adams, 271

---

[8] Although the actual hearing took place on October 16, 2006 -- nearly three weeks after opening statements -- the subpoenas that resulted in the hearing were issued before trial began, and the district court expressly stated at the start of the hearing that it was not part of the trial.

[9] Although the district court did not use the term "offer of proof," it is evident from the context that this is what the court intended. Black's Legal Dictionary defines offer of proof as "[a] presentation of evidence for the record (but outside the jury's presence) . . . so that the evidence can be preserved on the record for an appeal of the judge's ruling. . . . Such an offer may include tangible evidence or testimony (through questions and answers, a lawyer's narrative description, or an affidavit)." Black's Law Dictionary 1114 (8th ed. 2004).

F.3d 1236, 1241 (10th Cir. 2001) (discussing the several types of offer of proof, and expressing a preference for the question-and-answer type).

The defendants point to no precedent in the Supreme Court, this circuit, or elsewhere extending the Sixth Amendment public-trial right to an outside-of-trial, question-and-answer offer of proof -- or indeed, any type of offer of proof. Furthermore, the October 16 hearing differed in at least two fundamental respects from the categories of non-trial hearings to which the Sixth Amendment public-trial right has been held to apply in the past, such as hearings on motions to suppress, see, e.g., Waller, 467 U.S. at 47, and jury-selection proceedings, see, e.g., Owens, 483 F.3d at 62. First, the evidence elicited at the hearing had already (correctly) been ruled irrelevant. Cf. Brown v. Kuhlmann, 142 F.3d 529, 541 (2d Cir. 1998) (courtroom closure during trial did not infringe Sixth Amendment rights where it involved cumulative testimony related to matter collateral to charged offense). Second, the district court was under no obligation to hold the hearing in the first place, but chose to do so for our and the defendants' benefit when confronted with Vázquez's eleventh-hour request.

These differences render the Sixth Amendment precedent invoked by the defendants inapposite in the circumstances. While we leave open the possibility that the public-trial right may apply to some offer-of-proof hearings, we decline to recognize such a

-25-

right on facts as uncompelling as these.[10]  We accordingly reject this ground of appeal.[11]

The amici argue that the closure of the October 16 hearing violated the press and public's First Amendment right of access to criminal proceedings.  As a remedy, the amici ask us to lift the district court's seal on the hearing transcript along with the gag order on those who know its contents, so that the press may examine and report on what transpired there.

Crucially, however, the defendants did not raise this argument.  As we have often acknowledged, we ordinarily will not consider novel arguments advanced by an amicus on appeal, but not also raised by a party or another entity which has formally intervened.  See United States v. Sturm, Ruger & Co, Inc., 84 F.3d 1, 6 (1st Cir. 1996); Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 705 n.22 (1st Cir. 1994) (declining to address constitutional claims advanced by amici but not raised by parties); accord Knetsch v. United States, 364 U.S. 361, 370 (1960).  The

----

[10]  Vázquez would have us adopt a sweeping rule akin to that articulated by the Fifth Circuit in Rovinsky v. McKaskle, 722 F.2d 197, 200 (5th Cir. 1984), which seems to hold the Sixth Amendment right applicable to all but a very small fraction of pretrial and trial proceedings.  The facts of this case do not provide us reason to endorse such an expansive reading of the law.

[11]  We also note that it was entirely proper -- and indeed required -- for the district court to hold the hearing outside the presence of the jury, and thereafter to take measures to keep the irrelevant, and thus inadmissible, evidence from reaching the jury's eyes and ears.  See Fed. R. Evid. 103(c); United States v. Galin, 222 F.3d 1123, 1126-27 (9th Cir. 2000).

facts present us with no reason to depart from the general rule. Cf., e.g., United States v. Spock, 416 F.2d 165, 169 (1st Cir. 1969) (opting to consider amicus's arguments as to unconstitutionally broad applicability of statute criminalizing aiding and abetting Vietnam War draft dodging). The amici are, of course, free to return to the district court in an attempt to argue that changed circumstances have rendered the seal on the hearing transcript and related documentation no longer necessary, but that is an issue for the district court -- not us -- to decide.

Having disposed of the challenges to the closed relevancy hearing, we turn to the defendants' next assignment of error.

### C. The Alleged Witness Vouching

Vázquez and Morell next argue that certain statements made by Agent Vitousek during his testimony improperly vouched for the credibility of other government witnesses, made these witnesses more credible in the minds of the jurors, and thus unfairly prejudiced the outcome of the trial. We describe the specific instances of alleged vouching below, but begin with the applicable legal framework.

A prosecutor may not vouch for one of her witnesses by making personal assurances about him; she likewise may not accomplish this goal by putting on another government witness, such as an FBI agent, to make such assurances. This practice is prohibited because of its potential to shore up a witness's

credibility by putting the prestige of the United States behind him and thereby inviting the jury to find guilt on some basis other than the evidence presented at trial. United States v. Rosario-Díaz, 202 F.3d 54, 65 (1st Cir. 2000); accord United States v. Pérez-Ruíz, 353 F.3d 1, 13 (1st Cir. 2003) ("Although the prosecution's success often depends on its ability to convince the jury of a particular witness's credibility, it cannot entice the jury to find guilt on the basis of a [government] agent's opinion of the witness's veracity.").

The district court's decision to admit testimony over a preserved vouching objection is reviewed for abuse of discretion. United States v. Tom, 330 F.3d 83, 94 (1st Cir. 2003). In performing our inquiry, we consider various criteria, including the overall strength of the Government's case against the defendant, the prosecutor's willfulness in eliciting the statement from the witness who did the vouching, the strength and clarity of any curative instructions, and the likelihood that any prejudice that may have survived the instructions affected the outcome of the case. See United States v. Page, 521 F.3d 101, 108 (1st Cir. 2008); United States v. Cormier, 468 F.3d 63, 73 (1st Cir. 2006). In all events, we will not vacate a defendant's conviction on vouching grounds unless the error likely affected the outcome of the trial. Tom, 330 F.3d at 95; Rosario-Díaz, 202 F.3d at 65.

During the first twelve days of trial, the Government called several of the witnesses directly involved in the extortion scheme. Included among them were Cobián and several of the subcontractor-witnesses, all of whom received immunity in exchange for their cooperation or testimony, and the coconspirator Granados, who pled guilty to his role in the extortion and also cooperated with investigators. On the thirteenth day, the Government called Agent Vitousek, an experienced FBI fraud investigator.

The defendants identify four episodes in which Vitousek allegedly vouched for other government witnesses; we address these in turn. First, the Government sought to elicit from Agent Vitousek that the FBI had followed normal procedures in investigating this case. When the prosecutor asked Agent Vitousek why the FBI uses cooperating insiders as sources in fraud investigations, Vázquez interposed a vouching objection which the court overruled. Vitousek then described the procedure employed with cooperating insiders, stating such things as, "I will tell . . . these cooperating witnesses to tell the truth about the information they are going to provide us," and "a cooperating defendant . . . can explain exactly what happened." We fail to see how the jury could possibly have understood these generic descriptions of procedure -- with no reference to any specific individual or case -- to be Vitousek's assurances that Cobián and Granados were truthful in their dealings with the FBI or otherwise. As the defendants provide nothing more,

we will go no further than this.  See United States v. Parsons, 141 F.3d 386, 390 (1st Cir. 1988).

The second claimed instance of vouching occurred during cross-examination by Vázquez.  Vázquez asked Vitousek about an incident in which Cobián told investigators that a certain public official had accepted a bribe from him; the substance of the interview was memorialized in a nonpublic FBI report.  Later, Cobián admitted to the investigators that the official had not actually accepted a bribe.  Vázquez questioned Vitousek at length over why he failed to correct the FBI records on this point.  While conceding that mistakes had been made, Vitousek asserted that there was little likelihood of negative repercussions for the official because the government requires much more than a single interview before it will indict someone.  "Trust me," Vitousek added, "[w]e need much more evidence."  Vázquez argues that this testimony gave assurances to the jury that Vitousek would never seek the indictment of an innocent person, and that the FBI corroborated Cobián's information on Vázquez's role in the Superaqueduct extortion with "much more evidence."  Since Vázquez did not timely object to this testimony or move to strike it at trial, we review the challenge for plain error.  United States v. Brown, 510 F.3d 57, 72 (1st Cir. 2007). Here again, we fail to see how the jury could possibly have understood the testimony as bolstering the credibility of any of the

Government's witnesses, and Vázquez does not explain further. As such, we cannot find error, much less plain error.

The defendants' third vouching challenge gets them no further. During an exchange in cross-examination, Vázquez asked Agent Vitousek several times why the Government relied on Cobián despite its policy against dealing with cooperators who lie. Ultimately, the following exchange occurred between Vázquez and Vitousek:

> Q.    . . . Based on the records of other people, Cuco and Laracy and all the other people who the jury have heard from, you could prosecute Cobián?
>
> A.    Yes.
>
> Q.    And the Government has given him a benefit and chosen not to prosecute him.
>
> A.    He is cooperating.
>
> . . .
>
> Q.    He will not be prosecuted for the [Superaqueduct]?
>
> A.    If he tells the truth. And . . . up to now, the assessment has been that he has been truthful.

Vázquez objected to this last response as vouching. The district court overruled the objection, finding that Vázquez had "opened the door" to Vitousek's response. This ruling was entirely appropriate, and certainly not an abuse of discretion: Vázquez cannot complain about vouching in response to his own questions, United States v. García-Morales, 382 F.3d 12, 18 n.1 (1st Cir. 2004), especially when

-31-

he very purposely invited the answer he got by repeatedly questioning Vitousek about why he continued to deal with Cobián despite the latter's dishonesty, see United States v. Cutler, 948 F.2d 691, 697 (10th Cir. 1991) ("It is fundamental that a defendant cannot complain of error which he invited upon himself.") (quoting United States v. Taylor, 828 F.2d 630, 633 (10th Cir. 1987)) (internal quotation marks omitted).[12]

The fourth and final claimed instance of vouching is somewhat more problematic, but here too we must conclude that no abuse of discretion occurred. On redirect examination, the Government attempted to clarify an inconsistency raised during Morell's cross:

> Q.    . . . [D]o you recall, at the end of [Morell]'s cross-examination yesterday, he ask[ed] you about the difference between the amount of cash that José Cobián said he gave to Granados and the amount of cash which Mr. Granados admits he received?
>
> A.    Yes
>
> . . .
>
> Q.    Do you recall that [Morell] asked you, "Would it be fair to say one or both of those cooperators is lying about that?  Yes or no?"

---

[12]   The fact that, now on appeal, Morell belatedly signs on to Vázquez's challenge to this instance of alleged vouching does not compel a different conclusion with respect to Morell.  In any event, Morell failed to object at trial, and is thus relegated to plain error review, see Brown, 510 F.3d at 72; United States v. Palow, 777 F.2d 52, 54 (1st Cir. 1985), a standard he cannot satisfy on these facts.

A.    Yes.

Q.    And do you recall that you answered, "If you say that, yes." Please tell the members of the jury what you mean by that answer.

A.    . . . I want to explain that at no time I was agreeing with that statement. That is [Morell]'s statement, not mine. And I would like to explain exactly what my words are . . . .

. . .

Now, I want to say my words, and these are the words of Ivan Vitousek. At no time no witness brought here by the Government has lied under oath in this courtroom. . . .

At this, Vázquez objected on vouching grounds. The court indicated it would instruct the jury later, and allowed Vitousek to continue:

A.    . . . There is a discrepancy on the amounts of cash that were paid illegally by Mr. Cobián to Mr. Granados Navedo, and there is a discrepancy on the amount that Mr. Granados Navedo says that he received in cash from illegal payments from Mr. Cobián. That doesn't mean that they are lying. . . .

At sidebar after redirect, Vázquez moved to strike this testimony.[13] The court denied the motion because Morell had opened the door on cross by essentially asking Vitousek which of the two men -- Cobián or Granados -- was lying. The court opted instead to instruct the jury as follows:

The . . . duty to determine whether somebody has been truthful or not is yours. You are the

_____

[13] Vázquez also moved for mistrial, which the court denied. Vázquez then moved for severance from Morell, which the court also denied. He appeals neither of these rulings.

-33-

> judges of the believability of the witnesses. You will decide how much of a witness' testimony you are going to accept or you are going to reject.
>
> You should not take the testimony of Mr. Vitousek just now as him telling you that you should believe any witness. What he basically told you was that he, rightly or wrongly, believed what they told him, which is a different story.
>
> You are the sole judges of the credibility of the witnesses. You will decide . . . whether you believe Cobián [and] whether you believe Granados . . . , and how much of their testimony you are going to accept and how much you are going to reject.

The court's end-of-trial jury instructions contained similar language. Neither defendant objected to either set of instructions.

On appeal, Vázquez and Morell argue that Agent Vitousek's statements improperly vouched both for the government's witnesses in general, and for Cobián and Granados in particular. In the circumstances, we need not decide whether either statement constituted vouching because any error the district court may have committed in allowing this testimony to stand was harmless. The district court -- obviously mindful of the harm the impugned statements might cause to the defendants -- gave a curative instruction that the jurors not trust in Agent Vitousek's views on any witness's veracity, but instead judge veracity for themselves on the weight of the evidence. These instructions were timely (at most a few minutes after Vitousek uttered the statements), straightforward, explicit, and detailed. See Cormier, 468 F.3d at

-34-

74 (no prejudice where instructions were "'strong and clear'" (quoting United States v. Rodríquez-Estrada, 877 F.2d 153 (1st Cir. 1989)); accord Olszewski v. Spencer, 466 F.3d 47, 60 (1st Cir. 2006); United States v. Palmer, 203 F.3d 55, 59 (1st Cir. 2000). Moreover, as we have noted many times, we presume juries understand and follow the court's instructions, see, e.g., United States v. Kornegay, 410 F.3d 89, 97 (1st Cir. 2005), and Vázquez and Morell have given us no reason to believe that this jury acted any differently.[14]

Considering this factor together with the general strength of the Government's case against each defendant, we conclude that no prejudice survived the district court's curative instructions, and therefore any vouching that may have occurred could not have affected the outcome of the trial. See Page, 521 F.3d at 108; Cormier, 468 F.3d at 73. For this reason, the district court did not abuse its discretion in allowing this testimony to remain on the record and in continuing with the trial. Tom, 330 F.3d at 94.

Having disposed of all the vouching challenges, we proceed to the next assignment of error.

---

[14] We also note that the prosecutor did not willfully seek such a bold endorsement by Vitousek of the other witnesses' truthfulness. Instead, these statements appear to have been a spontaneous effort by Vitousek, who had obviously become frustrated with Morell's aggressive cross-examination, to set the record straight.

## D.  The Prosecutor's Closing Argument

The defendants argue that certain of the prosecutor's remarks in closing improperly disparaged defense counsel and suggested that the defense bore the burden of proof.  We again start with the applicable legal framework, and then address the specific instances of alleged misconduct.

If we find that remarks made by the prosecutor at trial rise to the level of prosecutorial misconduct, we analyze them for prejudice under the test in United States v. Manning, 23 F.3d 570 (1st Cir. 1994).  See United States v. Mooney, 315 F.3d 54, 59-60 (1st Cir. 2002).  We ask whether the prosecutor's behavior "so poisoned the well" that the defendant must be given a new trial. Manning, 23 F.3d at 573 (quoting United States v. Hodge-Balwing, 952 F.2d 607, 610 (1st Cir.1991)).  We consider a number of factors, including the egregiousness of the conduct; the context in which it occurred; whether the court gave curative instructions and what effect these instructions likely had; and the overall strength of the Government's case.  Id.; see also United States v. Casas, 425 F.3d 23, 38 (1st Cir. 2005) (misconduct evaluated through a "'balanced view of the evidence in the record'" (quoting United States v. Rodríguez-de Jesús, 202 F.3d 482, 485 (1st Cir. 2000))). We review de novo whether a given remark amounted to prosecutorial misconduct; if we conclude that it did, we review the overruling of a preserved objection to the making of the remark for abuse of

discretion.  Casas, 425 F.3d at 39; accord United States v. Robinson, 473 F.3d 387, 393 (1st Cir. 2007) (no vacatur if error harmless).

The defendants point to several passages in the prosecutor's closing argument that they say poisoned the well.  In opening summation, the prosecutor stated:

> You've heard and seen a whole lot of evidence of crime: Conspiracy, extortion, tax offenses, and of course obstruction of justice. And the defense has tried very hard to cloud and complicate the real issues in this case, to focus your attention on anyone, anything, but them.  That is their job.

In rebuttal, the prosecutor remarked along similar lines as follows:

> [T]he government in this case has been accused of political motivation.  Is there any evidence of that?  We have been accused of intentionally bringing in witnesses who would lie to you, creating a whole fabricated case against these defendants.  There is no evidence of this kind of behavior.  And it is offensive, and you should take it for what it is:  The acts of some very desperate lawyers, lawyers who want to cloud the evidence.

Here, Vázquez objected, but the court made no ruling.  The prosecutor continued:

> . . . [Morell] has told you repeatedly that if the Government did not bring you a witness, you are entitled to infer that witness would give evidence that would exculpate, that would prove his client is innocent.  Make no mistake, the defendant has no burden.  No defendant has any obligation to testify before the grand jury or at trial.  But the defendant has the same subpoena power as the Government.  And if [Morell] or [Vázquez], for that matter, thought they could subpoena a witness who would . . .

-37-

give you testimony that would exculpate the[m], you would have heard it.[15]

Vázquez again objected and the district court overruled.  The court did not give curative instructions.

The defendants make two main arguments.  First, they object to the prosecutor's statement that "if [Morell] or [Vázquez] . . . thought they could subpoena a witness who would . . . give you testimony that would exculpate their clients, you would have heard it"; they assert that this remark suggested to the jury that they had the duty to present the missing evidence.  See United States v. Díaz-Díaz, 433 F.3d 128, 135 (1st Cir. 2005) (such a suggestion "may cross the line").  Second, they contend that the prosecutor's characterization of them as "desperate lawyers" seeking to "cloud the issues" improperly disparaged defense counsel and their important role in the justice system.  See Manning, 23 F.3d at 573 n.1 (disapproving of prosecutor's remark that defense counsel were like "Shakespeare's players, full of sound and fury signifying nothing").

While we are reluctant to find categorically that these remarks constituted misconduct,[16] even assuming they did, we cannot

---

[15]   After Vázquez's objection was sustained, the prosecutor continued:  "You are entitled to disregard [Morell]'s argument that [Morell's secretary] had any relevant, important evidence to give in this case because the government did not call her. . . .  Don't go chasing off looking for witnesses you didn't hear."

[16]  For example, contrary to the defendants' suggestion, not every comment on a defendant's failure to produce evidence supporting his

conclude that they so poisoned the well under Manning that the defendants are entitled to a new trial.  First, the remarks are simply not that egregious, and come nowhere near the sort of remarks we have found, in rare cases, to mandate a new trial.  See, e.g., United States v. Hardy, 37 F.3d 753 (1st Cir. 1994) (conviction vacated where prosecutor drew analogy between defendant's running and hiding from police on the night of the crime, and running and hiding again at trial by invoking Fifth Amendment right not to testify); Manning, 23 F.3d 570 (conviction vacated where prosecutor suggested that government witnesses cannot lie and urged jury to "[t]ake responsibility for your community" by convicting defendant); United States v. Arrieta-Agressot, 3 F.3d 525 (1st Cir. 1993) (convictions vacated where prosecutor urged jury to consider case as battle in war against drugs, and defendants as enemy soldiers corrupting "our society").

Second, while the court did not give curative instructions, it did instruct the jury at the end of trial that nothing said during closing arguments could be taken as evidence, and must be disregarded if it did not conform to the jury's

_____

theory of the case is prohibited.  See Díaz-Díaz, 433 F.3d at 135 (citing United States v. Kubitsky, 469 F.2d 1253, 1255 (1st Cir. 1972)).  Indeed, in Díaz-Díaz, we suggested that such remarks would not be improper if made in response to defense arguments "aimed at having the jury draw the inference that the government did not call the [witness] because his testimony would have been harmful to its case." Id.  As discussed below, the remarks here would seem to fit this bill.

recollection of the evidence actually presented. The court also reminded the jury that the Government had the burden of putting on evidence to establish the defendants' guilt beyond a reasonable doubt, and that the defendants bore no burden at all. Again, Vázquez and Morell have given us no reason to believe the jury was somehow unable to follow these instructions, and we do not believe the impugned remarks "were of a caliber that would inherently compel jurors to disregard their duty." United States v. Levy-Cordero, 67 F.3d 1002, 1009 (1st Cir. 1995); cf., e.g., Rodríguez-de Jesús, 202 F.3d at 486 (no retrial required where court gave no curative instructions at time of remarks, but later instructed jury that counsel's statements were not to be taken as evidence); Levy-Cordero, 67 F.3d at 1009 (similar); Mooney, 315 F.3d at 60 (noting that end-of-trial instructions "are sometimes enough to neutralize any prejudice from improper remarks").

Third, on a comprehensive view of the record, the Government's case against these two defendants was strong. It rested on a solid foundation of testimony from several witnesses, including many personally involved (albeit often grudgingly) in the extortion and fraud schemes, as well as considerable documentary evidence.

Fourth, specifically with respect to the remark on the defendants' ability to subpoena witnesses, we have often acknowledged that retrial is not required where the prosecutor's

remarks, even if arguably improper, are a closely tailored response to defense counsel's equally improper remarks.  See, e.g., United States v. Nickens, 955 F.2d 112, 122 (1st Cir. 1992) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." (quoting United States v. Young, 470 U.S. 1, 12-13 (1985))); United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003) (same); see also United States v. Skerret-Ortega, No. 06-1126, 2008 WL 2402254, at *5 (1st Cir. June 13, 2008) (latitude given to prosecutors in responding to provocative remarks by defense counsel); United States v. Pérez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003) (similar).

Morell argued in closing that if a witness with relevant information was available to the Government, but the Government chose not to call the witness to testify, the jury could acquit him on the relevant count of the indictment.  He referred specifically to his secretary, who he argued would have corroborated his version of the facts had the Government called her.  In rebuttal a few minutes later, the prosecutor reminded the jury (as quoted above) that the defendants had no duty to put on evidence, but that they would have subpoenaed a given witness had they believed her testimony would exculpate them.  We find this to have been a limited, proportionate, and thus closely tailored, response to

Morell's rather outrageous invitation.  See Henderson, 320 F.3d at 107.

Finally, we are mindful of the Supreme Court's admonition that we not set guilty persons free simply to punish prosecutorial misconduct.  United States v. Auch, 187 F.3d 125, 133 (1st Cir. 1999) (citing United States v. Hasting, 461 U.S. 499, 506-07 (1983)).  Ordering retrial is a rare remedy to which we resort only where a miscarriage of justice would otherwise occur, or where the evidence weighs heavily against the jury's verdict.  Rodríguez-de Jesús, 202 F.3d at 486.  Neither of these conditions is present in the circumstances.

In sum, the impugned remarks, even if rising to the level of prosecutorial misconduct, did not poison the well to the degree required under Manning.[17]  We therefore reject this ground of appeal, and proceed to the next one.

---

[17]  In light of the several other factors militating against finding an abuse of discretion here, our conclusion remains the same even if, as Vázquez urges, we disregard the invited-response rule with respect to him because it was Morell who told the jury that uncalled Government witnesses would have exonerated him.

We also note that neither defendant objected at trial to the first "cloud the evidence" remark, made during the prosecutor's opening summation.  For convenience we have considered both "cloud the evidence" remarks in tandem, but if we were to consider them independently of one another, we would review the first one for plain error, see Henderson, 320 F.3d at 102, 107, and find that it comes nowhere near requiring retrial under that standard.

**E. Sufficiency of the Evidence Against Morell**

Morell mounts a broad challenge to the sufficiency of the evidence used to convict him. He argues that no rational jury could have found him guilty of any of the crimes of which this jury convicted him. Those crimes were: (1) conspiracy in Count One of the indictment; (2) Hobbs Act extortion of three subcontractors -- Feliciano, Carmona, and Laracy -- in Counts Two, Three, and Four, respectively; (3) wire fraud in Counts Nine to Eleven; and (4) mail fraud in Count Thirteen.[18]

Our central task in evaluating the sufficiency of the evidence is to determine whether a rational factfinder could have found each element of the crime in question beyond a reasonable doubt. United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006). Our review is plenary, looking at the record as a whole and "resolv[ing] all questions of credibility and reasonable inferences in favor of the verdict." Id.; accord United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992) ("[I]t is not the appellate court's function to weigh the evidence or make credibility judgments. Rather, it is for the jury to choose between varying interpretations of the evidence."). We need not be convinced that a guilty verdict was the only one available on the evidence, but merely that "a

---

[18] The indictment had fourteen counts. The jury acquitted Morell of Count Five, extortion of subcontractor Carrero; Count Twelve, one of the wire fraud charges; and Count Fourteen, obstruction of justice. Counts Six to Eight pertained only to Vázquez.

plausible rendition of the record" supports the verdict.  <u>Ortiz</u>, 966 F.2d at 711.  Evidence sufficient to support a guilty verdict may be entirely circumstantial, and the factfinder is "free to choose among reasonable interpretations of the evidence."  <u>United States</u> v. <u>Wight</u>, 968 F.2d 1393, 1395 (1st Cir. 1992).

Morell was convicted on three counts of Hobbs Act extortion by fear of economic harm or under color of official right; each of these counts pertained to the extortion of each of three subcontractors:  Feliciano, Carmona, and Laracy.  We begin our analysis by determining whether a rational jury could have found the elements of extortion for these three subcontractors.  The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do . . . shall be [punished]."  18 U.S.C. § 1951(a).  The Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of . . . fear, or under color of official right."  <u>Id.</u> § 1951(b)(2).  We have clarified that "fear" "encompasses 'fear of economic loss, . . . including the possibility of lost business opportunities.'"  <u>United States</u> v. <u>Rivera Rangel</u>, 396 F.3d 476, 483 (1st Cir. 2005) (quoting <u>United States</u> v. <u>Bucci</u>, 839 F.2d 825, 827-28 (1st Cir. 1988)).  Therefore, an individual commits Hobbs Act extortion if he:  (1) obtains property from another person; (2) with that person's consent; (3) through fear of

economic loss or under color of official right; and (4) the transaction affects interstate commerce.  Id.

Morell does not dispute the existence of the fourth element, and we find sufficient evidence in the record to establish this element[19] and the first three.  The first element is easily satisfied:  Cobián testified -- and a rational jury could have believed -- that the subcontractors made periodic cash payments to him between 1997 and 1999 which he then passed on to Vázquez, Morell, and Granados.  Several subcontractors verified that they made such payments to Cobián, and this testimony was supported by documentary evidence -- for example, sham checks from Carmona's business to non-existent individuals for unperformed services, so Carmona could generate the cash necessary to pay Cobián.  Feliciano also testified that he made one payment to Vázquez in person.  The second element is also easily met:  Feliciano, Carmona, and Laracy all testified that they agreed voluntarily (though reluctantly) to pay the money demanded, and a rational jury could have believed this testimony.

---

[19]  We have held that "the government need only show a realistic probability of a de minimis effect on interstate commerce[] in order to bring extortion within the reach of the Hobbs Act." United States v. Rivera-Medina, 845 F.2d 12, 15 (1st Cir. 1988); see also United States v. Hathaway, 534 F.2d 386, 396 (1st Cir. 1976) (Hobbs Act reaches "even those effects which are merely potential or subtle" (internal quotation marks omitted)).  We find ample evidence on the record before us to prove this element.

As for the third element -- inducement to pay by fear of economic loss or color of official right -- it, too, is established on the facts presented.  As an initial matter, the two components of this element are disjunctive, and an extortion conviction will stand if there is sufficient evidence to prove either component.  Id.  To prove the former, "the government must show that the victim reasonably feared that noncompliance with the putative extortionist's terms would result in economic loss."  United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006), cert. denied, 127 S. Ct. 1169 (2007).

The Government here put forth ample evidence to show that Feliciano, Carmona, and Laracy reasonably feared economic harm if they failed to pay the money demanded of them.  Feliciano, for example, testified that he agreed to pay the money because, if he did not, "[t]he government" could "make life very difficult" for his construction firm by delaying Superaqueduct project payments and not awarding the firm government contracts in the future.  Carmona testified that he felt compelled to pay and keep paying because if he failed to do so, the Thames-Dick consortium could be removed from the Superaqueduct project and his construction firm might also suffer other adverse consequences.  Laracy testified in a similar vein that he feared detriment to his business if he did not pay.  Feliciano, Carmona, and Laracy testified further that they knew the recipients of the money were people with influence in the NPP

-46-

government; they knew Granados to be among them; and Feliciano and Carmona also knew Vázquez to be among them.   Based on this testimony, a rational jury could have concluded beyond a reasonable doubt that Feliciano, Carmona, and Laracy paid Cobián out of fear of detrimental consequences for their respective businesses, and that this fear was reasonable because they believed the extortionists to have real power to effect such detriment.

The next critical question we must answer is whether a rational jury could have found Morell to be linked to the extortion scheme in a manner that allows criminal liability to be imputed to him.  We must therefore examine whether a rational jury could have found a conspiracy to exist, and Morell to be a member of it, as charged in Count One of the indictment.  To establish a conspiracy, the Government must prove three elements:   (1) an agreement to commit an unlawful act; (2) the defendant's knowledge of the agreement and voluntary participation in it; and (3) an overt act by at least one of the coconspirators in furtherance of the conspiracy.  United States v. Muñoz-Franco, 487 F.3d 25, 45 (1st Cir.), cert. denied, 128 S. Ct. 678 (2007).  The Government need not prove a formal agreement; instead, "[t]he agreement may be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose."  Id. at 45-46 (quoting Am. Tobacco Co. v. United States, 147 F.2d 93, 107 (4th Cir. 1944)) (internal quotation marks

-47-

omitted).   Morell's conviction may be sustained on sufficient evidence of a conspiracy to commit any of the three charged conspiracy offenses.   Id. at 46.   For purposes of the present analysis, we focus on conspiracy to commit extortion.

Morell does not seriously challenge the Government's evidence on the first and third elements of conspiracy, and we find an abundance of evidence in the record to support their existence. Cobián and Granados testified that Vázquez and Cobián devised a plan to compel the subcontractors to hand over a portion of their Superaqueduct profits.   As we have found above, a rational jury could have considered this compelled payment to constitute extortion -- the requisite unlawful act that is the object of the conspiracy. And the record reveals many overt acts in furtherance of such a conspiracy including, for example, Cobián's physical transfer of periodic cash payments from Feliciano and Carmona to Vázquez's medical office.

What remains, then, is the second element:  whether Morell knew of the extortion agreement and voluntary participated in it. The most direct evidence against Morell in this regard is Cobián's testimony about one of his initial meetings with Vázquez.   According to this testimony, Vázquez told Cobián that Morell and Granados would be assisting him in his efforts to secure the Superaqueduct contract for Thames-Dick, and that Cobián should approach Morell to work out how Morell wished to receive his share of the payments.

Yet even in the absence of this testimony, a rational factfinder could still have inferred that Morell knew of and adhered to the extortion agreement based on a significant quantum of other evidence. For example, Cobián testified that, in 1997, he approached Morell to arrange how the latter wished to receive his share. Cobián stated that Morell was not surprised to see him, but instead seemed to have been expecting him and had already devised a specific plan for concealing the transfer of the subcontractors' money. According to Cobián, Morell proceeded to draw up a sham legal contract and made several other elaborate arrangements to this end. Morell then accepted periodic payments from Cobián under the sham contract and through third-party payments from 1997 to 1999 -- a period largely overlapping with the period during which Vázquez and Granados were also receiving payments. Morell does not dispute that he received thousands of dollars from Cobián over the course of those two years.

As noted above, it is not for us to make credibility determinations on a review of the sufficiency of the evidence, but merely to say whether a rational jury could have believed this testimony. See Ortiz, 966 F.2d at 711. We find that a rational jury could have believed Cobián, and then drawn the reasonable inference that Cobián's payments to Morell were not for legal services and other licit ends, but were instead designed clandestinely to channel him his part of the extortionate proceeds.

-49-

A rational jury could then have drawn a second inference: that Morell obviously knew of, and voluntarily participated in, the scheme. Accordingly, a rational jury could have found all three elements of conspiracy beyond a reasonable doubt, and this jury's conviction of Morell under Count One was therefore supported by sufficient evidence.

This brings us to the sufficiency of the evidence as to the counts charging Morell with substantive crimes incident to the conspiracy. Contrary to Morell's assertion at oral argument, the law does not require proof that he personally took any steps to instill economic fear in the subcontractors, to influence the award of the contract or the payment for performance under the contract, or that the subcontractors feared Morell or even knew of his involvement. Instead, under the Pinkerton doctrine, a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable and committed in furtherance of the conspiracy. United States v. Gobbi, 471 F.3d 302, 309 n.3 (1st Cir. 2006) (citing Pinkerton v. United States, 328 U.S. 640, 647-48 (1946)). The district court properly instructed the jury on the Pinkerton doctrine. Based on overwhelming evidence in the record, the jury could rationally have found that Vázquez, Cobián, or Granados committed extortion. Through Pinkerton, such a jury could then have found Morell equally liable for the substantive offense, since extortion was committed in furtherance

of the conspiracy (and indeed was the conspiracy's object), and was a reasonably foreseeable result of the conspiracy. See Díaz-Díaz, 433 F.3d at 137.[20] For these reasons, Morell's substantive extortion convictions under Counts Two to Four of the indictment were also supported by substantial evidence.

The last set of convictions Morell challenges on sufficiency grounds stem from various instances of mail and wire fraud charged in Counts Nine to Eleven and Thirteen. In order to convict an individual of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, the Government must prove: "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme." United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996).

Counts Nine, Ten, and Eleven charged Morell with devising a scheme to defraud the Puerto Rico Treasury Department ("Hacienda") by failing to pay income taxes on revenue earned from the extortion. Each count lists a separate wire transaction of thousands of dollars

---

[20] Citing United States v. O'Campo, 973 F.2d 1015, 1021 (1st Cir. 1992), Morell argues that he cannot be held vicariously liable through Pinkerton because Vázquez and Granados had already committed extortion by the time he began receiving payments. We reject this argument, as extortion can be an ongoing crime, see, e.g., Bucci, 839 F.2d at 829-30, and this extortion went on until the payments ceased in 1999. In any event, a rational jury could have found that Morell adhered to the extortion agreement from its inception, and not merely from 1997, when he began receiving payments.

-51-

dated April 16, 1999 from Thames-Dick to Feliciano, Carmona, and Laracy, respectively. These were apparently chosen as representative samples of the monthly wire transfers Thames-Dick made to the subcontractors beginning in January 1997, a portion of which the subcontractors then handed over to Cobián, who in turn gave a portion to Morell, Vázquez, and Granados. The indictment charges that Morell failed to account for this 1999 income on his Puerto Rico tax return, and then used the mails to send the return to the Puerto Rico tax agency. This mailing was the basis for the mail-fraud charge in Count Thirteen.

Upon review of the record, we find sufficient evidence for a rational jury to have convicted Morell on all of these counts. A rational jury could have believed Cobián's testimony that Morell directed Cobián to funnel him the subcontractors' money through checks for sham legal services purportedly rendered to Cobián's company, and through payments to third parties for Morell's benefit. Such a jury could also have credited the certified copy of Morell's 1999 tax return in evidence, that failed to report payments made to him by Cobián in that year. A rational jury could likewise have believed Morell's tax preparer, who testified that Morell did not tell him about income earned from Cobián's company in 1999, and that he therefore did not include it on the 1999 return. These findings, in turn, would be sufficient to satisfy the first element for both

mail and wire fraud:  that Morell intentionally, knowingly, and willingly participated in a scheme to defraud Hacienda.  See id.

Specifically with respect to the wire-fraud counts, a rational jury could then have found the second element fulfilled -- that wire communications were used in furtherance of the scheme.[21] Morell need not have had any personal involvement in initiating the wire transfers; instead, the use of the wires need only have been "a reasonably foreseeable part of the scheme in which he participated."  Id. at 723 n.6 (quoting United States v. Boots, 80 F.3d 580, 585 n.8 (1st Cir. 1996)) (internal quotation marks and alteration omitted); accord United States v. Fermín Castillo, 829 F.2d 1194, 1198 (1st Cir. 1987) (it must have been reasonably foreseeable that use of the mails or wires would "follow in the ordinary course of business" (quoting United States v. Benmuhar, 658 F.2d 14, 16-17 (1st Cir. 1981)) (internal quotation marks omitted)); see also id. (case law on mail-fraud statute instructive for wire-fraud statute).  From the evidence presented, a rational jury could have inferred that it was reasonably foreseeable that interstate wires would be used in the ordinary course of business for Thames-Dick to transfer payments to the subcontractors.  These transfers were essential to the success of the extortion scheme and, in turn, the scheme to defraud the Puerto Rico tax agency, because they

---

[21]   The parties stipulated that the wire payments traveled in interstate commerce, so we need not address the evidence on this element.

provided the subcontractors the money they gave to Morell and the others, and which Morell then failed to report.  On the basis of such findings, a rational jury could thus have concluded that Morell was guilty of wire fraud on each of the three counts.[22]

Turning specifically to the mail-fraud count, a rational jury could also have found the second element fulfilled here -- that the mails were used in furtherance of the scheme.  The district court admitted into evidence a copy of a meter-marked envelope addressed to Hacienda and bearing a Hacienda receipt stamp, along with Morell's 1999 return.  Morell does not dispute that these were his envelope and return, but contends there is no proof that the return was actually placed in the mail.  We disagree, and conclude that a rational jury could have credited evidence that Morell mailed the return or reasonably expected that in the regular course of business, it would be mailed to Hacienda on his behalf.  Morell's tax preparer, who formerly worked for Hacienda, testified that when tax returns came in the mail, Hacienda kept the envelope and stapled it to the return, but would likely discard an envelope accompanying a hand-delivered return.  A rational jury could have believed this

---

[22]  Morell makes much of the fact that the indictment also alleges he committed fraud on his 1997 and 1998 tax returns, but the evidence used to show wire transfers for Counts Nine to Eleven consisted of April 1999 transactions made after the 1997 and 1998 returns had been filed.  We need not address this argument because all that was required to sustain Morell's convictions on these counts was sufficient evidence that he committed fraud on one of the returns, and the 1999 return meets this requirement.

testimony, and inferred from it that the 1999 return and the meter-marked envelope were actually mailed.  The evidence was therefore sufficient to support a finding of guilt by mail fraud.

For these reasons, we reject all of Morell's challenges to the sufficiency of the evidence, and proceed to the next ground of appeal.

### F.  Admission of Coconspirator Statement Against Morell

This ground of appeal, also advanced only by Morell, concerns Cobián's testimony on direct examination about one of the meetings in which Vázquez proposed the extortion scheme to Cobián. Cobián testified that he asked Vázquez who else would be helping the subcontractors to secure the Superaqueduct contract, and that Vázquez told Cobián it would be Morell and Granados.  At this, Morell objected on hearsay grounds, arguing that this testimony was inadmissible hearsay.  The district court provisionally allowed the testimony under our rule in United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), and later kept it on the record after assessing it in light of other evidence presented at trial.  See United States v. Mangual-García, 505 F.3d 1, 7-8 (1st Cir. 2007).  Morell now argues that this constituted reversible error because the testimony was the only piece of evidence linking him to a conspiracy involving Vázquez.

Our case law instructs district courts faced with a challenge to the admission of a coconspirator hearsay statement to

admit the statement provisionally and wait until the end of trial to consider four factors in the light of all the evidence: (1) whether a conspiracy existed; (2) whether the defendant was a member of the conspiracy; (3) whether the declarant was also a member of the conspiracy; and (4) whether the declarant's statement was made in furtherance of the conspiracy. Colón-Díaz, 521 F.3d at 35-36 (citing Petrozziello, 548 F.2d at 23; Fed. R. Evid. 801(d)(2)(E)). If these four conditions are satisfied by a preponderance of the evidence, the statement qualifies under the coconspirator exemption to the hearsay rule and may therefore be admitted into evidence -- including to prove the truth of the matter asserted. Id. at 35. We review preserved challenges to a Petrozziello determination (or a portion thereof) for abuse of discretion, and unpreserved challenges for plain error. Id. at 36-37.

In a sealed written order, the district court made the Petrozziello determination, finding the four Rule 801(d)(2)(E) factors satisfied by a preponderance of the evidence. Morell did not object to this assessment with respect to the first, third, and fourth Rule 801(d)(2)(E) factors, and does not quarrel with it now. As such, he forfeited any challenge to the court's findings on these factors. United States v. Thompson, 449 F.3d 267, 273 (1st Cir. 2006). As concerns the second factor -- whether Morell was a member of the conspiracy -- we have already concluded above that, on the

evidence presented at trial, a rational jury could have found Morell to be a member of the charged conspiracy beyond a reasonable doubt even absent Cobián's testimony that Vázquez implicated Morell during the meeting in question. A fortiori, the record contains ample evidence to support a finding by the requisite preponderance that Morell was a member of the conspiracy for purposes of Rule 801(d)(2)(E). Cf. United States v. Gjerde, 110 F.3d 595, 602 (8th Cir. 1997) (finding certain Rule 801(d)(2)(E) factors as necessarily satisfied by preponderance where court had already found the relevant facts proven beyond reasonable doubt). The district court did not, therefore, abuse its discretion in not striking the statement, and the jury was entitled to consider it for the truth of the matter asserted therein.

### G. Sentencing

As their final ground of appeal, Vázquez and Morell challenge the manner in which the district court calculated their respective GSRs under the Sentencing Guidelines. We review the district court's legal interpretation and application of the Guidelines de novo, but its loss or benefits calculations are reviewed only for clear error. United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008); United States v. Griffin, 324 F.3d 330, 365 (5th Cir. 2003).

At sentencing, the district court calculated the defendants' respective GSRs in the manner recommended by their

-57-

respective Presentence Reports ("PSRs"). It accordingly looked to § 2C1.1 of the 1998 Guidelines,[23] on "Extortion Under Color of Official Right":

> (a) Base Offense Level: 10.
>
> (b) Special Offense Characteristics
>
> . . .
>
>> (2) (If more than one applies, use the greater):
>>
>>> (A) If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase by the corresponding number of levels from the table in § 2F1.1 (Fraud and Deceit). . . .

U.S.S.G. § 2C1.1 (1998). Section 2C1.1(b)(2)(A) thus provides three alternative amounts, and the court must choose the greatest: (1) the value of the payment; (2) the benefit received or to be received in return for the payment; or (3) the loss to the government from the offense.[24]

---

[23] The PSRs recommended that the 1998 Guidelines be used by operation of U.S.S.G. § 1B1.11(b)(1) (2006). The district court followed this recommendation, and the parties did not object. We accordingly use the 1998 Guidelines as well, noting that while § 2C1.1 has been amended since 1998, the key language for purposes of analyzing the defendants' challenge remains virtually the same.

[24] It is undisputed that the third alternative -- loss to the government -- is not available because the government lost no money as a result of the extortion scheme. Pursuant to U.S.S.G. § 3D1.2 cmt. n.6 (1998), the district court did not make an independent determination of the defendants' sentences for defrauding the Puerto Rico tax authorities. As such, those losses played no part in the sentencing calculations in this case.

Relying on the PSRs, the district court determined that the alternative with the highest quantity was the "benefit to be received in return for the payment," which the court estimated as slightly over $10 million -- the approximate combined profit earned by the subcontractors for their work on the Superaqueduct project. Following the directive in § 2C1.1(b)(2)(A), the court then looked to § 2F1.1, which instructed it to increase the defendants' respective offense levels by fifteen because the "loss" the defendants caused exceeded $10 million.  Id. § 2F1.1(b)(1)(P) (1998).  Added to the base offense level of ten (which was undisputed), the defendants were left with offense levels of twenty-five, along with respective Criminal History Categories of I.  This produced a GSR of fifty-seven to seventy-one months.  After undertaking the remainder of the sentencing analysis, including an examination of the factors in 18 U.S.C. § 3553(a), the court sentenced Vázquez and Morell toward the lower end of this range, to sixty months' imprisonment each.  The defendants timely objected to the methodology used to produce this sentence.

On appeal, Vázquez and Morell argue that the district court erred in choosing the "benefit to be received" alternative because there was no evidence that the subcontractors received the roughly $10 million in profits "in return for the payment." U.S.S.G. § 2C1.1(b)(2)(A).  According to the defendants, it was undisputed that the Thames-Dick consortium was the most qualified

of the bidders, and there was no evidence that Vázquez or Morell actually exerted any real influence on anyone responsible for awarding Thames-Dick the contract. As Granados testified, the coconspirators' promise to help the subcontractors was merely an insurance policy to make sure nothing happened that would impede the awarding of the contract -- not to compel or persuade the relevant officials to award it. Therefore, because Thames-Dick was awarded the contract based on its and the subcontractors' own merit through a process not tainted by the defendants' crime, the "benefit . . . to be received <u>in return for the payment</u>" was zero, and the court must sentence the defendants under the (much lower) "value of the payment" alternative in § 2C1.1(b)(2)(A). The district court did not make specific findings on the amount of money the defendants actually received, but other evidence suggested it was below $1 million for each defendant.

We begin by determining whether the district court committed legal error in its interpretation of the meaning of "benefit . . . to be received in return for the payment" in § 2C1.1(b)(2)(A). This is a question of first impression in this circuit. Evident from the plain language of the guideline -- "benefit . . . <u>to be received</u>" -- is the Sentencing Commission's intention that this inquiry be forward-looking, a conclusion also reached by the Fifth Circuit in one of the rare cases interpreting the guideline in the context of extortion, as opposed to bribery:

"[I]n determining the amount of benefit to be received, courts may consider the expected benefits, not only the actual benefits received."  Griffin, 324 F.3d at 366 (emphasis added).  This prospective analysis comports with our closely analogous case law on computing loss for purposes of sentencing.  We have held that when a person is convicted of a fraud offense, a proper analysis of the loss he intended to cause asks what a person in his position at the relevant time would reasonably have expected to happen to the victim as a result of the fraud.  See Innarelli, 524 F.3d at 291.  The rationale for an ex ante inquiry lies in the purpose of the exercise:  to set the defendant's punishment at a level commensurate with the degree of his moral culpability.  For this reason, it is not determinative what loss the victim actually ended up suffering, or indeed whether the victim suffered any loss at all.  Id.[25]

This reasoning translates readily into the extortion context.  We think that the best interpretation of "benefit . . . to be received in return for the payment" is the benefit a person in the defendant's position at the time of the extortion would reasonably have expected the victim to receive by paying him the money he demanded.  See Griffin, 324 F.3d at 366.  This figure, in turn, affords the court a gauge for how severely the defendant

---

[25]  As we noted in Innarelli, this rationale contrasts with that for restitution, which is "necessarily a backward-looking inquiry" because the defendant can only be made to reimburse the victim for the loss he actually caused to the victim.  524 F.3d at 294.

deserves to be punished.  We reject the defendants' invitation to look with 20-20 hindsight at whether, at the end of the day, they actually did anything overt to help Thames-Dick get the contract. As reasonable expectation at the time of the extortion is the touchstone of the inquiry, the district court's interpretation was the right one.

As for the amount of the benefit in this case, neither defendant contests the district court's estimate of slightly more than $10 million, a figure the court described as conservative.  In any event, our review of the record reveals this estimate to be reasonable, and a reasonable estimate is all that is required.  See Innarelli, 524 F.3d at 290; Griffin, 324 F.3d at 365.  We therefore see no reason to deem this quantity clearly erroneous.  United States v. Gray, 521 F.3d 514, 542-43 (6th Cir. 2008) (amount of benefit to be received reviewed for clear error); Griffin, 324 F.3d at 365 (same).

Since more than $10 million is undisputably greater than the other available alternative in § 2C1.1(b)(2)(A) -- the value of the payments to Vázquez and Morell -- the district court properly used it to determine how many additional levels to add to their respective base offense levels.  See U.S.S.G. §§ 2C1.1(b)(2), 2F1.1(b)(1)(P).  Accordingly, the court's GSR calculation for each defendant was correct, and in the absence of any further sentencing challenges, our review ends there.

### III.  Conclusion

For the foregoing reasons, we <u>affirm</u> Vázquez's conviction and sentence, and <u>affirm</u> Morell's conviction and sentence.

**<u>Affirmed</u>**.