# United States Court of Appeals
## For the First Circuit

No. 09-2402

UNITED STATES OF AMERICA,

Appellee,

v.

ELAINE BROWN,

Defendant, Appellant,

No. 10-1081

UNITED STATES OF AMERICA,

Appellee,

v.

EDWARD BROWN,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

Leslie Feldman-Rumpler for appellant Elaine Brown.

Dean Stowers, with whom Stowers Law Firm was on brief, for appellant Edward Brown.

Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney was on brief, for appellee.

———————

January 19, 2012

———————

**THOMPSON, Circuit Judge**.  A nine-month long stand-off between United States Marshals (the "Marshals") and husband and wife team, Edward and Elaine Brown, resulted in the Browns' criminal convictions.  Edward and Elaine[1] each appealed and we consolidated.  Both claim that the district court committed a myriad of errors justifying reversal. After careful consideration, we reject each argument and affirm.

## BACKGROUND[2]

### A. The Tax Evasion Trial

To put this appeal in context, we begin with another criminal matter involving the Browns.  In April 2006, Edward and Elaine were indicted by a federal grand jury on charges relating to their failure to pay federal income tax - an omission that stemmed from the Browns' belief that they were not legally obligated to do so.  The Browns were tried and in January 2007, the jury returned a verdict convicting Edward and Elaine of conspiracy, federal tax crimes, and other financial crimes.  Edward, who had stopped attending trial after only a few days, was convicted in absentia. Both Edward and Elaine were sentenced to just over five years in prison.  Neither Brown attended the sentencing.  Nor did they surrender to federal authorities.

---

[1] For ease of reference we refer to the Browns by their first names.

[2] Further details can be found in United States v. Gerhard, 615 F.3d 7 (1st Cir. 2010).

-3-

Therefore, Stephen Monier, United States Marshal for the District of New Hampshire, sent the Browns a letter urging them to surrender. The Browns had not only been sentenced to prison but both had warrants out for their arrest - Edward for failing to appear at trial and Elaine for violating the terms of her release. The Browns did not comply with Monier's request and remained holed up in their secluded Plainfield, New Hampshire home, situated on an approximately one-hundred-acre tract of land. And so the Marshals hatched a plan for their arrest.

## B. The Arrest

Because the Marshals had information that the Browns were armed and making threats, they elected not to simply enter the property and arrest them. Instead the Marshals conducted surveillance, which revealed a pattern of Edward traveling daily to the top of his driveway on an all-terrain vehicle and picking up his mail. The Marshals decided to attempt an arrest during this jaunt to the mailbox. The plan failed.

On June 7, 2007, Marshals were in place to make the arrest when Daniel Riley, a friend of the Browns came strolling up the driveway. Riley was alerted to the Marshals hiding in the woods, apparently by the Browns' dog whom he was walking. Riley fled despite being ordered to stop. Marshals fired non-lethal ammunition at Riley but missed, though he was eventually subdued with a taser. Edward heard the commotion and appeared at the tower on top of his house with a .50 caliber rifle, but he did not fire.

After the botched attempt to arrest Edward, the Marshals revised their approach. By that time, the Browns' case had gained national notoriety and supporters of the couple were flocking to their home. The Browns themselves were hosting festival-type gatherings at their home publicizing their resistance. The Marshals planned to take advantage of this by posing undercover as supporters and accomplishing the arrests in this capacity.

In October 2007, undercover Marshals made contact with the Browns through a confidential informant and learned that the couple wanted to retrieve some possessions from Elaine's dental office in Lebanon, New Hampshire.[3] On October 4th, undercover Marshals retrieved the property and brought it to the Browns' Plainfield home. The Marshals unloaded the property into the garage as Edward leveled an assault rifle at them, all the while expressing a reticence to trust people he did not know. Edward however eventually warmed up to the undercover officers and replaced the assault rifle with a handgun in his waistband and invited them to join him for beers and pizza. The group hung out on the Browns' front porch and at some point Elaine joined them, also carrying a handgun. They chatted about the couple's legal woes including their thus far successful evasion of arrest. When asked by one of the deputies how they had managed this feat, Edward responded that authorities were afraid to arrest him because if

---

[3] Elaine had a long career as a dentist prior to becoming a fugitive from the law.

they did people would die, including the "Marshal," "Chief of Police," and "Sheriff."

The gathering continued in this fashion until one officer was able to maneuver himself between Edward and Elaine, at which time he gave a predetermined signal and the Marshals pounced. Neither Edward nor Elaine went quietly but eventually both were subdued and cuffed. Following their arrests, agents searched the Brown property and found a vast supply of explosives, firearms, and ammunition, including rifles, armor piercing bullets, pipe bombs, and bombs nailed to trees.

## C. The Conspiracy Trial

The nine-month long stand-off resulted in the Browns' indictment. Both Edward and Elaine were charged with: (1) conspiring to prevent federal officers from discharging their duties under 18 U.S.C. § 372; (2) conspiring to assault, resist or impede federal officers under 18 U.S.C. §§ 111(a) and (b) and 371; (3) using or carrying a firearm or destructive device during and in relation to a crime of violence; and possessing a firearm or destructive device in furtherance of a crime of violence under 18 U.S.C. § 924(c)(1)(A) and (B); (4) being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1); (5) obstruction of justice under 18 U.S.C. § 1503; and (6) failing to appear at sentencing under 18 U.S.C. § 3146. Edward was also charged with failing to appear at trial in violation of 18 U.S.C. § 3146. After an eight

day jury trial, Edward and Elaine were convicted on all counts.[4] Edward was sentenced to 37 years in prison and Elaine to 35.

This appeal followed. In it, Edward and Elaine each challenge their convictions on multiple but distinct grounds.[5] We address each party's arguments separately.

## ANALYSIS

### A. Edward Brown

### 1. Competency to Stand Trial

Although Edward's counsel did not raise his client's competency as an issue pre-trial,[6] the trial judge addressed it sua

---

[4] The relevant particulars of the trial are discussed in our analysis of the Browns' claimed errors.

[5] Edward and Elaine each sought to join the other's arguments pursuant to Fed. R. App. P. 28(i); however, they have not effectively done so. Adoption by reference cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case. See United States v. Casas, 425 F.3d 23, 30 n.2 (1st Cir. 2005). In this context, issues that are averted to in a perfunctory manner absent developed argumentation are waived. See id. Here Edward's attempt to join Elaine's arguments was textbook perfunctory - he offered no explanation as to why her arguments pertained to him. As for Elaine, she simply stated that three of Edward's arguments are "equally applicable to both defendants." This treatment is far too lackadaisical. Thus, the Browns' attempted arguments by reference are forfeited. Elaine did however offer some reasoning as to why Edward's competency argument pertained to her - namely that the district court's holding forced her to proceed to trial with an incompetent co-defendant. We need not decide whether this qualifies as developed argumentation, as we reject Edward's competency claim.

[6] Defense counsel did question Edward's competency post-trial during the sentencing phase. We discuss more fully below.

-7-

sponte.[7]  The court did so by questioning Edward at a pre-trial status conference.  It did not hold a formal competency hearing or order a competency evaluation.  After the status conference, the court issued a written decision declaring Edward competent to stand trial.   The court held that although Edward embraced an unconventional belief system, he demonstrated an understanding of the nature and consequences of the proceedings and an ability to consult with counsel. In making this finding, the trial judge considered in-person interactions with Edward, the record in this case, and the record in Edward's previous tax evasion case.  On appeal, Edward argues that the district court erred by finding him competent without the benefit of a formal competency hearing or competency evaluation and was wrong in its conclusion.  We disagree.

To begin with, it is well settled that the conviction of a person legally incompetent to stand trial violates due process. See Johnson v. Norton, 249 F.3d 20, 26 (1st Cir. 2001) (citing Pate v. Robinson, 383 U.S. 375, 378 (1966)).  To challenge the district court's finding of competency, Edward "must present facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to [his] mental

---

[7] The way this came about was that Elaine's counsel filed a motion questioning her competency to stand trial.  The trial judge assessed Elaine's competency at a status conference and on his own initiative also assessed Edward.  The judge found both Edward and Elaine competent to stand trial.  Only Edward contests this finding.

competence." United States v. Collins, 949 F.2d 921, 927 (7th Cir. 1991) (internal quotation marks and citation omitted) (alteration in original). "When there has been no hearing, and no examination of the defendant whatsoever, the appellate court reviews the district court's findings comprehensively." United States v. Lebron, 76 F.3d 29, 32 (1st Cir. 1996).

The test for competency is whether the defendant first has sufficient present ability to consult with counsel with a reasonable degree of rational understanding, and second has a rational and factual understanding of the proceedings against him. See United States v. Ahrendt, 560 F.3d 69, 74 (1st Cir. 2009) (citing Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)). "The 'understanding' required is of the essentials - for example, the charges, basic procedure, possible defenses - but not of legal sophistication." Robidoux v. O'Brien, 643 F.3d 334, 339 (1st Cir. 2011). A district court must sua sponte order a competency hearing if there is reasonable cause to believe that a defendant is mentally incompetent. See Ahrendt, 560 F.3d at 74 (citing 18 U.S.C. § 4241(a)). Thus we query whether there was reasonable cause to believe Edward incompetent. After scouring the record, we answer this question in the negative. Based on the same reasoning, we find no fault in the court's determination of competency.

We start with Edward's ability to consult with counsel. While it appears that in the beginning Edward had some misgivings

-9-

(based upon his unique legal philosophies) about whether his attorney could adequately represent him,[8] a review of the record reveals no indication that Edward was unable to consult with his attorney during this representation. In particular, when Edward's attorney sought to withdraw just moments prior to the start of trial based on a communication breakdown, the court denied the motion, finding that neither counsel nor Edward could articulate any specifics regarding the alleged breakdown. It is also significant that once trial was underway Edward's attorney, who more than any other courtroom player "enjoys a unique vantage for observing whether [his] client is competent," United States v. Muriel-Cruz, 412 F.3d 9, 13 (1st Cir. 2005), did not raise any concern about Edward's competency. Further, when Edward's attorney moved for a post-trial, pre-sentencing competency evaluation, he acknowledged Edward's ability to consult with him during trial, stating that Edward "was minimally able to assist counsel in the preparation and presentation of a defense" and only after trial did things drastically change.[9]

We conclude that although Edward's relationship with his attorney might not have always been genial, there is no evidence

---

[8] Edward saw counsel as representative of a "legal fiction" and as "a foreign agent of the Bar Association."

[9] It bears noting that after this alleged deterioration of Edward's mental state, he was in fact deemed competent following an extensive psychiatric evaluation and a full competency hearing where the examining psychologist was subject to direct and cross-examination.

that Edward could not consult with him "'with a reasonable degree of rational understanding.'"  Ahrendt, 560 F.3d at 74 (quoting Dusky, 362 U.S. at 402).  We do not think the district court erred when it found likewise.

As for Edward's understanding of the nature of the proceedings against him, we also concur with the district court's determination.  To be sure, Edward made comments that on their face could lead one to question whether he even understood what was happening.[10]  Yet, he also made statements that evidenced a rational and factual understanding of the legal system.[11]

Edward further made a significant number of comments that reflected his atypical legal beliefs[12] and overall distrust of the

---

[10] Edward stated that he thought the purpose of his arraignment was to release him and his wife but instead it was "going 180 degrees" from what he anticipated.  When asked at the status conference if he understood the consequences facing him, Edward said "I assume.  I assume.  I don't know what it all means."

[11] Edward exhibited an understanding of the legal players: (1) judge ("he was to make sure both sides behaved themselves and followed the rules or the decorum of that courtroom" and make sure that defendant's "rights and privileges were protected"); (2) jury ("assumed" that the jury was to make impartial decisions based on the evidence); and (3) prosecutor (would "dig out the truth").

[12] If it could be given a label, Edward's belief system appears most akin to the so-called sovereign citizen movement whose proponents believe they are not subject to federal or state statutes or proceedings, reject most forms of taxation as illegitimate, and place special significance in commercial law. See Wikipedia, http://en.wikipedia.org/wiki/Sovereign_citizen_movement (last visited January 13, 2012).  Edward's comments reflected this philosophy.  He repeatedly indicated that he did not recognize the district court or the laws it operated under.  He also referred to himself and Elaine as "secured party creditors" and stated that a criminal case is really a "commercial transaction."  He referred to

-11-

legal system.[13]  Viewed in context, these words and behaviors (though often bizarre) did not evidence confusion on Edward's part about the legal proceedings against him, but rather reflected firmly held, idiosyncratic political beliefs punctuated with a suspicion of the judiciary.  Moreover, while some of these beliefs reflected a misunderstanding of the law (namely that the district court did not have jurisdiction over him and that it was a commercial court) they do not render Edward incompetent to stand trial.  See Robidoux, 643 F.3d at 339 (finding that although defendant's belief that the court had no jurisdiction was a misunderstanding of the law, it was "a common illusion among certain groups alienated from society" and did not prevent him from "knowing that the government has put him on trial, recognizing the procedures to be used, or appreciating advice that lack of authority claims will not constitute an effective defense").  In fact, Edward's contention that courts have no authority over him is not a new one for federal judges.  See, e.g., id. at 339 n.4 (gathering cases); United States v. Gerhard, 615 F.3d 7, 25 (1st Cir. 2010).  As we have previously stated, "[s]ometimes these

_____

the court as "nothing but a commercial court" and "one of the biggest businesses in the country."

¹³ Edward expressed a belief that most courts do not follow their own rules but just make them up as they go along.  He also opined that the prosecutor and judge were in collusion and together influenced the jury's decision.  Of his previous case, Edward said he "realized that we were not going to get a fair or equitable trial."

beliefs are sincerely held, sometimes they are advanced only to annoy the other side but in neither event do they imply mental instability or concrete intellect . . . so deficient that trial is impossible." Robidoux, 643 F.3d at 339 (quoting United States v. James, 328 F.3d 953, 955 (7th Cir. 2003)).

To sum up, after a comprehensive review of the district court's findings, we do not find reasonable cause to believe Edward mentally incompetent. Therefore the district court was not required to sua sponte order a formal competency hearing and evaluation. Edward's first argument is without merit; we turn to his next.

## 2. Tax Trial and Tax Law Evidence

At trial, Edward sought to present evidence of his beliefs that his previous tax trial was a sham and that tax laws are unconstitutional. Edward claimed this evidence would show that he lacked the mens rea or intent for the two conspiracy counts.[14] Over the defense's objection, the trial judge excluded the evidence as irrelevant. Before this court, Edward claims this exclusion violated his constitutional right to defend himself. We review this constitutional question de novo. See Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 496 (1st Cir. 2011).

---

[14] Edward also argued that the evidence was relevant to establish a justification defense; however, he has abandoned this argument on appeal.

Whether it is rooted in the Fourteenth Amendment or in the Sixth Amendment, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Brown v. Ruane, 630 F.3d 62, 71 (1st Cir. 2011) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). However, an "accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissable under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). Edward's proposed defense was that he lacked the mens rea or intent[15] to commit the substantive offenses underlying the conspiracy counts: (1) preventing the Marshals from discharging their official duties (Count 1, 18 U.S.C. § 372) and (2) assaulting, resisting, or impeding the Marshals while engaged in their official duties (Count 2, 18 U.S.C. §§ 111, 371). In other words: according to Edward, he could not have intended to thwart the Marshals in the performance of their "official duties" because he did not believe they were engaged in "official duties" since he considers tax laws unconstitutional and therefore his tax trial conviction illegitimate. This circuitous logic is faulty.

Edward was well aware that he was convicted at trial and that there was a warrant out for his arrest. Therefore his belief that the Marshals lacked authority to arrest him (assuming the

---

[15] See United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010) (to establish voluntary participation in a conspiracy there must be an intent to agree and an intent to commit the substantive offense).

belief was genuinely held) would have been based on an assumption that the conviction and warrant were invalid - the invalidity stemming from the supposed sham nature of the tax trial. The problem with this reasoning is that it presupposes that the constitutionality of Edward's conviction, and the validity of the warrant, impact whether the Marshals were engaged in "official duties." They do not, and thus Edward's mens rea as to these facts is irrelevant. Whether a federal officer is engaged in official duties "does not turn on whether the law being enforced is constitutional or applicable to the defendant, or whether the levy order being enforced was validly obtained; rather it turns on whether the federal officer is acting within the scope of what [he] is employed to do . . . or is engaging in a personal frolic of his own." United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009) (internal quotation marks and citation omitted) (interpreting the phrase "official duties" in 18 U.S.C. § 111(a)).

There was more than sufficient evidence from which a fact finder could conclude that Edward knew that the Marshals were engaged in official duties. Similarly, there was more than enough evidence that Edward intended to prevent the Marshals from discharging those official duties and intended to assault, resist, or impede them in the performance of such duties (e.g., the arsenal of guns and bombs Edward accumulated and peppered his property with, the concerts and media statements publicizing his resistance, and Edward's statements that law enforcement officers would die if

-15-

they tried to capture him).  And as we said - Edward's subjective beliefs about the legitimacy of tax laws and his tax trial were irrelevant as to whether he intended to commit these offenses.[16] Accordingly, the court did not err in disallowing the evidence. This signals an end to Edward's constitutional claim since the constitutional right to present a defense is not impaired "where the evidence proffered has been properly ruled irrelevant." United States v. Vázquez-Botet, 532 F.3d 37, 51 (1st Cir. 2008); see also United States v. Maxwell, 254 F.3d 21, 26 (1st Cir. 2001) (a criminal defendant's "wide-ranging right to present a defense . . . does not give him a right to present irrelevant evidence") (internal citation omitted).  We proceed to Edward's final argument.

---

[16] Edward offers a somewhat confusing alternate argument. Essentially, he claims that even if the evidence was not relevant as to his intent to commit the substantive offenses, it was relevant to show that he did not "willfully" join the conspiracy - the term used by the trial judge in the jury instructions. Edward seems to argue that by using the term "willfully" the judge created some additional or heightened burden. We do not see it this way. This court has held that the meaning of "willfully" in the context of a criminal conspiracy is "that the defendant intended to join in the conspiracy and intended the substantive offense to be committed." United States v. Gonzalez, 570 F.3d 16, 24 (1st Cir. 2009) (internal quotation marks and citation omitted).  The trial judge's instruction reflected this definition. See id. (finding a proposed jury instruction identical to the one given here to accurately reflect the meaning of "willfully").  Because the court's use of the term "willfully" did not result in an added or heightened intent requirement, we need not embark on any additional analysis.

### 3. **Hearsay Statements**

Edward contends that the following statements were improperly excluded at trial as hearsay: (1) Edward's statement to Marshal Stephen Monier that he would turn himself in if someone would show him the relevant law; (2) Edward's statement to Deputy Marshal Gary DiMartino that the judge in his tax trial would not allow him to present evidence; (3) Edward's testimony that the judge in his tax trial cleared the courtroom to make sure no one heard Edward's witnesses or evidence; and (4) Edward's statements made during a radio interview expressing a belief that the Marshals were trying to kill him and so he had to defend himself.[17] Edward argues that these statements were not hearsay because they were not offered for the truth of the matter asserted, but rather to show that Edward lacked the mens rea or intent for the underlying conspiracy counts. Review of preserved objections to rulings concerning admissibility of evidence is for abuse of discretion. See United States v. Epstein, 426 F.3d 431, 437 (1st Cir. 2005).

We need not embark on any protracted hearsay analysis as the proffered statements flunk the relevancy test. As discussed at length above, Edward's subjective beliefs about the legitimacy of tax laws and his conviction, and his paranoia toward the Marshals,

---

[17] Edward makes an alternate argument that his radio interview statements are admissible under the rule of completeness, Federal Rule of Evidence 106. This rule is inapplicable for a variety of reasons, including lack of any predicate statements. See United States v. Verdugo, 617 F.3d 565, 579 (1st Cir. 2010).

were irrelevant to the conspiracy counts or any viable defense thereof. The disputed statements were offered only as evidence of those personal beliefs and therefore were properly excluded. Since we may affirm a district court's evidentiary ruling on any ground apparent in the record, we reject Edward's hearsay argument. See United States v. Meserve, 271 F.3d 314, 327 (1st Cir. 2001). The court did not abuse its discretion in excluding the evidence. This concludes our analysis of Edward's arguments. We turn to Elaine's.

## B. Elaine Brown

### 1. Cumulative Error Doctrine

Elaine argues that reversal is warranted because multiple evidentiary errors occurred at trial. In her opening brief, Elaine sets forth the errors in one undelineated heap and it is unclear whether she is claiming that each supposed error warrants reversal independently or only when taken together. Elaine clarified her position somewhat in her reply brief when she referred to one of the alleged errors as being part of a series, which taken together warrant reversal.

Viewing Elaine's claim in the most positive light (and charitably assuming that it has been adequately briefed and raised, thus warranting consideration on the merits) it appears that Elaine, without specifically saying so, is relying on the so-called "cumulative error doctrine". See United States v. Colón-Díaz, 521 F.3d 29, 33 (1st Cir. 2008); United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993). This doctrine is predicated on the

-18-

theory that "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect."  Sepulveda, 15 F.3d at 1195-96.  Again assuming that a cumulative error argument has been adequately raised and briefed, we proceed to address the merits of each claimed error.  See, e.g., Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 49 n.10 (1st Cir. 2011) (declining to find a plaintiff's claim waived, even though his brief was "barely adequate," when there was no prejudice in reaching the issue).  But see KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 25 (1st Cir. 2003) (finding that an appellant waives any issue not adequately raised in the initial brief).

### i. Testimony About Threats

Marshal Stephen Monier and Marshal David Robertson were called by the government to testify about the Browns' capture. Elaine takes issue with both witnesses' testimony that the Browns were making threatening statements toward law enforcement prior to their arrest.  She claims the testimony was not based on personal knowledge and was hearsay.

The statements at issue are: (1) when asked why Marshals did not just drive on to the Brown property and arrest them, Monier responded "[b]ecause our surveillance and information indicated to us that they were armed . . . [t]hey were making statements"; (2) when summarizing a letter he wrote the Browns, Monier indicated that the couple "continued to make threatening statements"; and (3)

-19-

when asked why Marshals used armored personnel carriers, Robertson stated "[t]here were a number of statements made and threats made toward law enforcement and other officials."

Different standards of review are in play. Elaine contemporaneously objected to statement one and so we review the court's decision to admit the statement for abuse of discretion. See United States v. Polanco, 634 F.3d 39, 44 (1st Cir. 2011). Prior to trial (in response to a motion in limine) Elaine objected to the admission of any testimony from Monier that was hearsay or not based on personal knowledge. Therefore our review of statement two is also for abuse of discretion.[18] See Polanco, 634 F.3d at 44. Finally, Elaine did not object to statement number three and thus we are in the plain error realm. See id.

Let us start with the personal knowledge issue. "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Evidence of personal knowledge can come in the form of the witness's own testimony. See id. Testimony is "inadmissable under Rule 602 only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed what he

---

[18] The court explicitly denied Elaine's request to exclude Monier's testimony and so Elaine's objection was properly preserved for purposes of appeal. See Fed. R. Evid. 103(a) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection . . . to preserve a claim of error for appeal.")

testified to."  United States v. Rodríguez, 162 F.3d 135, 144 (1st Cir. 1998) (internal quotation marks and citation omitted). Implicit in this standard is the requirement that we not indulge in review by hindsight but consider what evidence was before the trial judge at the time each of the three challenged statements was made. We do so, beginning with Monier.

Prior to his making statement one,[19] Monier's testimony established the following.  Monier was the United States Marshal for the District of New Hampshire and was in command of the operations to capture the Browns in 2006 for their tax crimes and in 2007 following their convictions.  Prior to the 2006 arrest, Marshals collected information about the Browns and Monier assigned deputies to conduct surveillance of the couple.  When the Browns failed to appear for trial, Monier's chief deputy Gary DiMartino made telephone contact with them.  Monier also indicated that prior to the 2007 arrest, "[w]e were talking to the Browns" and urging them to surrender.  Prior to making statement two[20] (in addition to all the above testimony), Monier testified that Marshals were monitoring the internet and media coverage of the Browns and that the Browns were making statements to the media.

---

[19] Monier:  "[b]ecause our surveillance and information indicated to us that they were armed . . . [t]hey were making statements."

[20] Monier:  the Browns "continued to make threatening statements."

-21-

This testimony does not compel a finding that Monier "could not have actually perceived or observed" the threats. Rodríguez, 162 F.3d at 144 (internal quotation marks and citation omitted). Rather the evidence, up until that point, indicated that Monier could have heard the threats from speaking with the Browns directly, listening in on conversations of the Browns, or from viewing videos of the Browns speaking to the media.[21] As there was an adequate foundation of personal knowledge, the trial judge did not abuse his discretion in admitting Monier's testimony (statements one and two).

Similarly an adequate foundation was laid for Robertson's testimony (statement three).[22] Prior to making the disputed statement, Robertson testified that he was commander of the Marshals Special Operations Group stationed in Virginia. His unit was tapped to assist in the Browns' 2007 capture. They were briefed on the on-going situation by the New Hampshire Marshals and then gathered information. From then on, Robertson was in charge of the entire tactical operation.

Admittedly the foundation here is somewhat more tenuous than with Monier. But Monier's testimony came before Robertson's

---

[21] Incidently, Elaine's counsel did not elicit any testimony during Monier's cross-examination that would contradict this inference and perhaps lend the previous testimony to a motion to strike.

[22] Robertson: "[t]here were a number of statements made and threats made toward law enforcement and other officials."

-22-

and thus the trial judge might have reasonably concluded, at that point in the proceedings, that Robertson could have listened to recorded conversations or watched media coverage of the Browns during his briefing from the New Hampshire Marshals. Further, we are in plain error purview here and "under plain error review, we have leeway to correct only the most egregious of unpreserved errors." United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005). The trial court's failure to exclude this one statement of Robertson's certainly does not qualify. This disposes of Elaine's contention that the statements were not based on personal knowledge.

Elaine's second argument is that the statements were hearsay. The government's response is that the statements were not offered to prove that the Browns were actually making threats but only to show why the Marshals created such an elaborate arrest plan and why this plan was reasonable. The district court took the same view, repeatedly instructing the jury that testimony about the Browns' threats was not offered for the truth of the matter asserted but to show why the Marshals did what they did.

It is axiomatic that "an out-of-court statement, which would be inadmissable hearsay if offered to prove the truth of what was asserted in the statement, may be properly admitted to prove other facts." United States v. Benitez-Avila, 570 F.3d 364, 368 (1st Cir. 2009). Those other facts however must be "relevant to an issue in the trial" and "the potential prejudice resulting from the

-23-

likelihood that the jury might consider the statement for its impermissible hearsay purpose [must] not unfairly outweigh its proper probative value on the other question." Id.; see also Fed. R. Evid. 403.

We agree that the three statements were not hearsay because they were admitted solely to show why it was reasonable for the Marshals to have such an intricate arrest plan. The reasonableness of the arrest plan was "relevant to an issue in the trial" because Elaine made it so. Benitez-Avila, 570 F.3d at 368. Specifically, Elaine claimed during her opening statement that she had to protect herself against what she believed was unlawful government force - force her counsel referred to as "the same sort of lethal government force as the civilian victims in the 1992 shooting of Randy Weaver's wife and son at Ruby Ridge, Idaho, and of the 1993 government assault at the Branch Davidian complex in Waco, Texas." Elaine's counsel conceded at oral argument that this analogy suggests the Marshals were trying to kill the Browns or at least that was how the Browns perceived it.

Because Elaine opened the door by questioning the reasonableness of the Marshals' arrest plan during her opening statement (though the court ultimately did not let her advance this defense), the government had the right to introduce evidence to counter her claim. See United States v. Landry, 631 F.3d 597, 603 (1st Cir. 2011) (affirming the district court's finding that evidence of a defendant's earlier traffic stop was relevant and

admissible because the defendant opened the door during opening statement by putting forth a good faith and computer error defense). As a result, Monier and Robertson's testimony was relevant. Cf. Benitez-Avila, 570 F.3d at 368-69 (hearsay testimony the government offered to show that police had a reasonable basis for investigating the defendant was not admissible, in part, because the defendant did not challenge the reasonableness of the investigation and therefore the testimony was irrelevant). Further, the potential prejudice from this testimony is not outweighed by its probative value, which was significant - rebutting the argument that the Marshals were out to kill the Browns. Our conclusion: the court did not abuse its discretion in admitting statements one and two as non-hearsay, nor did it commit plain error by admitting statement three.

To recap, a sufficient personal knowledge foundation was laid for Monier and Robertson's testimony and the testimony was not hearsay. Elaine's first argument under the cumulative error doctrine fails. We move on to her next.

### ii. Overview Testimony

Elaine contends that Marshal Monier gave improper overview testimony. Prior to trial, Elaine objected to Monier testifying as an overview witness, and thus we review for abuse of discretion. See United States v. Rosado-Pérez, 605 F.3d 48, 54 (1st Cir. 2010). "Even if there was an error, however, we affirm if it was harmless." Id.

Generally speaking, a so-called "overview witness" is a government agent who testifies in a criminal matter as the prosecution's first witness (or at least as one of its earliest witnesses) and provides an overview of the prosecution's case to come. See, e.g., United States v. Flores-de-Jesús, 569 F.3d 8, 14 (1st Cir. 2009). We have considered the propriety of the practice of using overview witnesses, and cautioned against its pitfalls, on multiple occasions. See United States v. Meises, 645 F.3d 5, 18 (1st Cir. 2011); Flores-de-Jesús, 569 F.3d at 14; United States v. Casas, 356 F.3d 104, 119-20 (1st Cir. 2004). We identified the following potential ramifications of overview testimony as making it inherently problematic: (1) the jury could be influenced by statements of facts and credibility determinations not in evidence; (2) later testimony could be different from what the overview witness assumed; and (3) the jury may place greater weight on evidence that they perceive has the imprimatur of the government. See Flores-de-Jesús, 569 F.3d at 16-17; Casas, 356 F.3d at 119-20.

With these concerns in mind, we consider Monier's testimony. Monier was called as the government's first witness. After testifying about his job duties, Monier moved on to his interactions with the Browns. He testified about the plan the Marshals developed to arrest the Browns in 2006 for their tax crimes and how the plan was executed. Monier explained how the Browns failed to appear at the tax trial, the outcome of the trial, and how Elaine violated her conditions of release - essentially

-26-

Monier gave background information on why warrants were issued. He described the Marshals' plan for executing the warrants and also briefly touched on the unsuccessful June 7th arrest attempt, focusing on what he observed via video surveillance from the command center. Monier moved on to his attempts to get the Browns to surrender and the new plan to infiltrate their home posing as supporters. He then gave a one-sentence long summary of the arrest. Finally, Monier indicated that a post-arrest sweep of the residence was performed but he did not testify about what was found.

A careful review of this testimony reveals that it was not improper overview. Monier oversaw the two operations to arrest the Browns and his testimony involved events he observed and orchestrated during this oversight. This type of "testimony is permissible and 'valuable to provide background information.'" Meises, 645 F.3d at 15 (quoting Flores-de-Jesús, 569 F.3d at 19). Further, the government laid a sufficient personal knowledge foundation for the testimony, distinguishing it from previous overview testimony we have taken issue with. Cf. Meises, 645 F.3d at 15 (DEA agent only learned of the inculpatory conduct he testified to from an informant); Casas, 356 F.3d at 118-19 (DEA agent's testimony was partially based on information he received from a co-conspirator who did not testify).

Also significant is the fact that Monier did not express an opinion as to the culpability of the Browns - a practice we have

found most troubling in this context. Specifically, we have previously encountered instances where the government witness essentially testified that the defendant was guilty of the crimes charged. See Meises, 645 F.3d at 15 (finding improper overview testimony when a DEA agent identified the defendants' individual roles in a drug trafficking operation); Flores-de-Jesús, 569 F.3d at 26 (finding inappropriate overview testimony when a DOJ agent used a photographic chart to identify the defendants as members of a drug conspiracy and to set forth their roles); Casas, 356 F.3d at 118-19 (finding improper overview testimony when a DEA agent testified that defendants were members of a drug trafficking organization that handled massive quantities of drugs). Monier offered no such testimony.

Further, there is no danger of Monier's testimony endorsing the testimony of later witnesses and thus adding the "imprimatur of the government" to the later testimony. Casas, 356 F.3d at 120 (expressing concern that prosecutors could use a government agent to bolster a later dubious witness). First, as a practical matter, all of the later witnesses who testified about the Browns' resistance and arrest were government agents (Marshals; Bureau of Alcohol, Tobacco, Firearms and Explosives; and Internal Revenue Service agents who participated in the attempted capture, capture, and/or post-arrest sweep). Second, the majority of the subsequent agents' testimony pertained to topics that Monier did not go into detail about - the botched arrest attempt, the actual

arrest, and the weapons that were discovered in the post-arrest sweep of the home. In the minimal areas where Monier and the other agents' testimony did intersect, there do not appear to be any contradictions.

We are satisfied that Monier did not offer inappropriate overview testimony. It necessarily follows that there was no abuse of discretion on the district court's part in admitting the evidence. We proceed to the next supposed error.

### iii. Books

During trial, the government introduced several books that Marshals had recovered from a shelf in a hallway in the Brown home. The titles were: "The Anarchist Handbook," "Guerilla Warfare and Special Forces Operations," "Unconventional Warfare Devices and Techniques," "Booby Traps," and "Modern Chemical Magic." The trial judge admitted the books over Elaine's objection, which was based on lack of foundation and unfair prejudice under Rule 403. Before this court Elaine asserts that the court's admission of the books was prejudicial error. In support, she draws our attention to the dearth of evidence physically connecting her to the books, and also to the fact that the prosecutor referenced the books' titles during closing argument and read an excerpt from one, claiming that it reflected the Browns' belief system. Because Elaine objected at trial, we review the court's admission of the books for abuse of discretion. See Polanco, 634 F.3d at 44.

Although relevant, evidence may be excluded if it is prejudicial. See Fed. R. Evid. 403. However, the evidence must be unfairly prejudicial and that prejudice must substantially outweigh the probative value. See United States v. Li, 206 F.3d 78, 85 (1st Cir. 2000). A district court's Rule 403 determination is entitled to deference. See United States v. Gentles, 619 F.3d 75, 87 (1st Cir. 2010), cert. denied, 131 S. Ct. 622 (2010). "Accordingly, 'only rarely - and in extraordinarily compelling circumstances - will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgement concerning the relative weighing of probative value and unfair effect.'" Id. (quoting Li, 206 F.3d at 84-85).

We have had prior opportunity to consider an argument similar to Elaine's. In United States v. Ford, the defendant, who was convicted of multiple drug crimes, argued that the trial court erred in admitting into evidence a book found in his home entitled "Secrets of Methamphetamine Manufacture." 22 F.3d 374, 375 (1st Cir. 1994). We disagreed, finding that the book was relevant to show that the defendant was a drug dealer as opposed to simply a drug user and that its probative value was not outweighed by prejudice. See id. at 381-82.

The Sixth Circuit Court of Appeals has faced a similar argument. In United States v. Rey, the defendant, who was convicted of conspiracy to possess and distribute cocaine, argued that the trial court erroneously admitted into evidence books found

in his home. 923 F.2d 1217, 1221 (6th Cir. 1991). A sampling of the books' titles included: "How to Launder Money," "Tax Havens in the Caribbean," and "DEA Domestic Operations Guidelines." See id. at 1219. The books were not only admitted into evidence, but a DEA agent also testified that they were indicative of illegal drug trafficking. See id. In that case, the Sixth Circuit found that the books were relevant because they made it more probable that the defendant committed the charged crimes and that the books were not unduly prejudicial. See id. at 1221-22. We reach a result similar to those reached in Ford and Rey.

At a minimum, the books and titles were relevant to show that Elaine had knowledge of how to conduct armed resistance against the government and the factual implementation of such resistance. This probative value (despite Elaine's best effort to convince us otherwise) was not substantially outweighed by unfair prejudice.

First, we disagree that prejudice resulted simply because there was no testimony or forensic evidence tying Elaine to the books. There is no requirement that such evidence be introduced. And notably there was no evidence that would compel us to conclude that the books were solely Edward's. The books were found out in the open, in the hallway, in the home that Elaine and Edward had lived in for almost twenty years and had been holed up in for nine months. The books' location is sufficient to raise the inference

that the books were Elaine's or at the least owned by Elaine and Edward together.

Nor are we persuaded by Elaine's somewhat confusing contention that the prosecutor's closing argument reference to the books "demonstrates the prejudice" to her. We are concerned with whether the trial court erred in admitting the books, and our "analysis must 'evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.'" United States v. Varoudakis, 233 F.3d 113, 124 (1st Cir. 2000) (quoting Old Chief v. United States, 519 U.S. 172, 183 n.6 (1997)). The fact that the prosecutor referenced the books days after the court ruled them admissible is not relevant to our inquiry.[23]

To sum up, there are simply no "extraordinarily compelling circumstances" that would convince us to reverse the trial judge's on the spot determination on the books' probative value versus unfair prejudice. Gentles, 619 F.3d at 87. The court did not abuse its discretion. We turn to Elaine's next offering.

---

[23] To be clear, we are offering no opinion on whether the manner in which the prosecutor used the books during closing argument - as reflective of the Browns' belief system - was appropriate. As we said, this is not relevant to our inquiry. Elaine's bone of contention is with the books' admission and there is no indication in the record that she sought a limiting instruction or requested that the books be admitted for a limited purpose.

### iv. Firearm Possession Testimony

Elaine takes issue (more on her specific issue below) with Marshal Monier's and Marshal Jeffrey White's testimony that Elaine was armed at the time of her 2006 arrest on tax evasion charges. Here is a brief summary of the testimony and the court's response to that testimony.

Monier testified once that Elaine was armed during the 2006 arrest - an answer that he got out before defense counsel was able to object. However, once defense counsel did object the court sustained the objection, and sustained a second similar objection, at which time the prosecutor abandoned the line of questioning. As for White, he also stated only once that Elaine was armed - he responded "yes" when asked whether he found a weapon on Elaine during the 2006 arrest. This again was objected to and the court sustained the objection and instructed the jury to disregard the testimony; an instruction the jury is presumed to have followed. See Morales-Vallellanes v. Potter, 605 F.3d 27, 34-35 (1st Cir. 2010). Arguably, White implied one additional time that Elaine was armed during the 2006 arrest - he testified "we did a strip search [of the Browns] to ensure they had no additional weapons on them." (emphasis added). Defense counsel did not object. Thereafter, the prosecutor attempted a few more times to elicit testimony regarding the gun, defense counsel timely objected before White could respond, and the court sustained the objections. The trial judge even cautioned the prosecutor at sidebar to cease the line of

questioning, noting his concern with bringing in evidence of a previous legal possession of a firearm (which the 2006 possession was) since Elaine was now being tried for illegal possession of a firearm. The prosecutor complied and Elaine's counsel did not request a curative instruction.

This brings us to Elaine's argument. She asserts that this testimony, though by her own admission properly excluded by the court, was nonetheless heard by the jury and, according to her, this exacerbated the prejudicial effect of the other testimony she complains of (i.e., the overview and hearsay testimony). However, Elaine does not point to any erroneous ruling on the court's part or any misconduct on the prosecutor's part. Faced with no specificity as to what error Elaine is claiming, or as to the legal grounds on which she is relying, we decline to tackle her hollow contention. This takes us to Elaine's final submission of error.

### v. Mens Rea Evidence

Elaine (like Edward) claims the court erred by excluding evidence of her motivations for resistance, which was relevant to her intent or mens rea. We thoroughly considered this argument when Edward made it and will not rehash. The district court did not err when it excluded the evidence.

### Cumulative Error End Result

We have reached the end of Elaine's assortment of evidentiary arguments. Because we have found no merit in any of her individual complaints, it necessarily follows that her trial

was not tainted by cumulative error and reversal is not warranted. See Colón-Díaz, 521 F.3d at 40. We forge ahead to Elaine's next ground for appeal.

## 2. Section 924(c) Jury Instructions and Verdict Form

Count 4 of the indictment charged Elaine with violating 18 U.S.C. § 924(c). The statute provides that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be subject to additional imprisonment over and above that for the underlying crime of violence.[24] 18 U.S.C. § 924(c)(1)(A). The term of imprisonment is set at "not less than 5 years." Id. § 924(c)(1)(A)(i). However, if "the firearm . . . is a destructive device," then the term of imprisonment is "not less than 30 years." Id. § 924(c)(1)(B)(ii).

Elaine was found guilty of Count 4 and sentenced to thirty years under subsection (B)(ii) pertaining to destructive devices. She claims this conviction should be reversed because the verdict form, and some portions of the jury instructions, did not articulate the § 924(c) offense correctly. Since Elaine did not object at trial, we review for plain error. See United States v. Fisher, 494 F.3d 5, 9 (1st Cir. 2007). To satisfy the plain error standard, Elaine "must show: (1) that an error occurred (2) which

---

[24] Here Counts 1 and 2 of Elaine's indictment were the underlying crimes of violence - conspiring to prevent Marshals from discharging their duties and conspiring to resist, impede or assault the Marshals.

was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks and citation omitted). The plain error standard is "so demanding that we have characterized it as cold comfort to most defendants pursuing claims of instructional error." Troy, 618 F.3d at 33 (internal quotation marks and citation omitted).

Elaine takes issue with the following phrase, which was used by the judge multiple times during jury instructions and was contained on the verdict form: "carrying, using or possessing a firearm, including a destructive device, in connection with a crime of violence." (emphasis added). Undoubtedly, this phrase does not mirror the precise language of the statute. Section 924(c) contains two separate charges - first, using and carrying a firearm during and in relation to a crime of violence and second, possessing a firearm in furtherance of a crime of violence. This court has held that the "in furtherance" element of § 924(c) "imposes a 'slightly higher standard' of liability than the nexus element corresponding to the different charges of using or carrying a firearm, which need only occur 'during and in relation to' the underlying crime." United States v. Delgado-Hernández, 420 F.3d 16, 25 (1st Cir. 2005) (quoting H.R. Rep. No. 105-344, at 11 (1997)). In particular, the phrase "in furtherance of" suggests

more of a nexus between the possession and the underlying crime. See id.

Here it is unclear what the trial judge meant by the "in connection with" phrase, though it seems likely that it was intended as a type of shorthand to encompass both the "during and in relation to" and "in furtherance of" elements, both of which were before the jury for consideration. It is also possible that the trial judge took the "in connection with" phrase directly from the indictment where it was used in the Count 4 heading, followed by a correct description of the two separate charges in the body of the count. In either event, the heightened "in furtherance" standard that pertains to the possession charge was not present in the court's phraseology (though it was present at another point, which we will get to). We, like Elaine, find this omission troubling. However, we do not find reversible error. We first consider the jury instructions.

### i. Jury Instructions

When applying the plain error standard in the context of jury instructions, "we look at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury." Troy, 618 F.3d at 33. Here, the court used the problematic phrase seven times during its instruction on the § 924(c) count[25] - three times when first

_____

[25] The court used the phrase once more when it was reading the jury the verdict form and explaining it to them. We discuss the

describing what Elaine was charged with and another four times during the Pinkerton instruction.[26]   Sandwiched in between these seven statements, however, the judge said the following: "the government must prove . . . beyond a reasonable doubt [that] defendant knowingly carried or used a firearm including a destructive device during and in relation to, or possessed a firearm including a destructive device in furtherance of, the commission of that crime of violence."   In this statement, the judge set forth precisely and accurately the elements of § 924(c). The court also went on to define the phrases "possess" and "in furtherance."

        As a result, the jury, though confronted with several questionable articulations of § 924(c), had all the precise elements of the crime set forth in the portion of the charge pertaining to what the government must prove beyond a reasonable doubt.   The jury was also provided with a written copy of the entire instructions, and thus could reference the correct description of the two charges and their respective elements.   The jury could do the same with the copy of the indictment that was

---

impact of the language being contained on the verdict form below.

   [26] Under the Pinkerton theory of liability, the jury could find Elaine, by virtue of her membership in the conspiracy, substantively liable for the foreseeable criminal conduct of Edward (his violation of § 924(c)) during the course of and in furtherance of the conspiracy.  See Bucci v. United States, 662 F.3d 18, 36 (1st Cir. 2011); United States v. Hansen, 434 F.3d 92, 103 (1st Cir. 2006) (citing Pinkerton v. United States, 328 U.S. 640, 645-48 (1946)).

provided to them during deliberation, which as noted above, correctly differentiated between the two charges in the body of Count 4.

So although the court's "in connection with" language may have been ambiguous in the abstract, the rest of the jury instruction lent content to it. See Victor v. Nebraska, 511 U.S. 1, 14-17 (1994); Gilday v. Callahan, 59 F.3d 257, 261 (1st Cir. 1995). Further, the "test of jury instructions is not abstract perfection" and instead we consider them "as a whole to determine whether they correctly summarize the relevant law." Hopkins v. Jordan Marine Inc., 271 F.3d 1, 4 (1st Cir. 2001) (finding that no harm was done when the trial judge twice used the phase "the proximate cause" when it should have been "a proximate cause" because this language was juxtaposed with a clear and explicit statement about causation). The use of the shorthand "in connection with" phrase in both the indictment and instructions was unfortunate. Nonetheless, in considering the overall instructions, which included the court's clear recitation of the precise § 924(c) elements, we cannot say that the jury was led astray or harm was done. It is further noteworthy that a "misdescription or omission of an element of a crime does not necessarily constitute plain error" in the context of jury instructions. United States v. Nishnianidze, 342 F.3d 6, 16 (1st Cir. 2003) (citing Neder v. United States, 527 U.S. 1, 9-10 (1999)) (finding no plain error when a trial judge incorrectly stated in jury instructions that the

existence of a threat is determined by a recipient's reaction because the judge later set forth the correct reasonable speaker standard pertaining to threats).  We conclude that as a whole, the jury instructions provided an accurate description of the § 924(c) charge.  Our analysis continues with the verdict form.

### ii. Verdict Form

The jury verdict form contained the same imperfect language as the instructions.  It read:

> **COUNT IV: CARRYING, USING OR POSSESSING A FIREARM IN CONNECTION WITH A CRIME OF VIOLENCE**
>
> 3. We, the Jury find the Defendant, Elaine Brown, [blank space] of carrying, using or possessing a firearm in connection with the crime of violence charged in Count I or II.
>
> . . .
>
> **COUNT IV: CARRYING, USING OR POSSESSING A DESTRUCTIVE DEVICE IN CONNECTION WITH A CRIME OF VIOLENCE**
>
> 4. We, the Jury find the Defendant, Elaine Brown, [blank space] of carrying, using or possessing a destructive device in connection with the crime of violence charged in Count I or II.

In both blank spaces, the jury hand-wrote "Guilty."

"We have consistently expressed that a verdict form . . . must be reasonably capable of an interpretation that would allow the jury to address all factual issues essential to the judgement." United States v. Riccio, 529 F.3d 40, 47 (1st Cir. 2008) (internal quotation marks and citation omitted).  We review the verdict form "as a whole, in conjunction with the jury instructions, in order to

determine whether the issues were fairly presented to the jury." Id.

It is without question that the verdict form did not set forth all of the elements of § 924(c). However, a district court need not reiterate all of the elements of a crime in a verdict form if they were properly set forth in the jury instructions. See Riccio, 529 F.3d at 47. Here the § 924(c) elements were indeed set forth correctly (albeit only once) in the jury instructions. Thus, reading the instructions and verdict form together (which the jury had the opportunity to do), we think the § 924(c) issue was fairly presented.

In the end, we do not see grounds for reversal. While we think the better practice would have been for the trial judge to consistently mirror the statute's language, we conclude that any error with the use of the "in connection with" phrase was far from obvious. This holding is consistent with our previous treatment of the "in connection with" phrase in the context of § 924(c). See Delgado-Hernández, 420 F.3d at 26 (denying defendant's request to set aside a plea because the district court did not commit plain error when it referred to the § 924(c) charge as "possession of the firearm in connection with the drug trafficking crime" during the plea colloquy). Elaine's argument fails. This leaves us with her final assertion on appeal.

### 3. In-Chambers Jury Questioning

Robert David Vonkleist was a witness who testified for the defense at trial. The substance of Vonkleist's testimony is not at issue so it suffices to note that he was a friend of the Browns who participated in one of their Plainfield home concerts. What is pertinent is what Vonkleist did at the conclusion of his testimony. As he was leaving the stand, he stated "God save us all. God save us all." Alerted to the comment by the prosecutor, the trial judge asked the jurors to indicate by a show of hands whether they heard Vonkleist make any remark. Six jurors indicated they had.

The judge brought counsel into chambers and expressed a concern that Vonkleist's conduct was contemptuous. In order to address this possibility, the judge decided to bring each juror who heard the comment into chambers individually (with counsel present) to ask what he or she heard. Elaine's counsel requested that the questioning take place in open court, but the judge declined. The in-chambers colloquy with each juror then proceeded like so. The judge asked the juror what they heard and each responded.[27] The judge then ordered the juror to disregard the statement and asked whether they could comply with this order. Each juror answered in the affirmative. The judge also gave counsel the opportunity to

---

[27] Some jurors heard Vonkleist's exact wording, while others heard some variation of the phrase, ranging from "God help us" to "Save yourselves." One juror thought Vonkleist mumbled something about power.

ask questions but, other than Edward's counsel asking one juror whether the statement was out-loud or mumbled, all counsel declined. This was the extent of the questioning.

Elaine's point of contention is with the trial judge's decision to question the jurors in-chambers. The argument is two-fold. First, according to Elaine, the in-chambers questioning violated her constitutional right to be present at trial. Secondly, she asserts the questioning violated her constitutional right to a public trial. Since we are faced with questions of law, our review is de novo. United States v. Garcia-Ortiz, 528 F.3d 74, 85 (1st Cir. 2008).

### i. Right to Be Present

In situations where confrontation is not at issue, a criminal defendant's right to be present at trial is protected by the Fifth Amendment Due Process Clause. See United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam) (stating that the constitutional right to presence is protected by the Due Process Clause "in some situations where the defendant is not actually confronting witnesses or evidence against him"). This right is codified in Rule 43 of the Federal Rules of Criminal Procedure. See Fed. R. Crim. P. 43(a) (unless as otherwise provided, "the defendant must be present at . . . every trial stage").

The Supreme Court has previously addressed the right to be present in a matter similar to the one at hand. In Gagnon, the defendants, like Elaine, took issue with an in-chambers discussion

-43-

between the trial judge and a juror. See Gagnon, 470 U.S. at 524-25. The judge had brought the juror into chambers after the juror expressed apprehension about seeing one of the criminal defendants sketching pictures of the jury. See id. The judge alleviated the juror's concerns and then asked whether he could continue to serve as an impartial juror and the juror confirmed he could. See id. at 524. On review, the Supreme Court found that the in-chambers conference did not violate the defendants' rights to be present, either under the Fifth Amendment or Rule 43. See id. at 526, 529. We do the same.

The "mere occurrence of an ex parte conversation between a trial judge and juror does not constitute a deprivation of any constitutional right." Id. at 526 (internal quotation marks and citation omitted). Nor does the defendant have a constitutional right to be present at every interaction between a judge and juror. Id. However, the defendant does have a Fifth Amendment due process right to be present when his presence is needed to ensure fundamental fairness or a reasonable substantial opportunity to defend against the charges. See id. at 526-27. Those considerations are not in play here.

The trial judge's very brief conference with the six jurors was conducted for a circumscribed purpose - to determine whether Vonkleist should be subject to contempt charges. In fact, Vonkleist had completed his testimony and though the contempt issue arose out of Elaine's trial, Vonkleist's conduct and the court's

-44-

possible response to his conduct had nothing to do with Elaine or the crimes she was charged with. Rather it was a matter of the judge protecting the integrity of the courtroom. The judge went about accomplishing this (with all counsel present) by simply asking the jurors what they heard and then verifying that they could disregard the statement. Elaine's attendance was hardly necessary to ensure that this discourse was fair, nor would she have gained anything from attending. As aptly stated by the Supreme Court, the "Fifth Amendment does not require that all parties be present when the judge inquires into such a minor occurrence." Id. at 527. Elaine cannot prevail on Fifth Amendment grounds.

Nor can she prevail under Rule 43. If a defendant is entitled under Rule 43 to attend a portion of the trial not taking place in open court, then "the defendant or his counsel must assert that right at the time; they may not claim it for the first time on appeal from a sentence entered on a jury's verdict of 'guilty.'" Id. at 529. Neither Elaine nor her counsel requested that she be present for the in-chambers questioning. Counsel, who attended the questioning, was assuredly aware that it was taking place and there is no indication that Elaine was unaware of it.[28] Elaine's failure

---

[28] The judge announced his intention to question the jurors in-chambers during a conference with counsel. Elaine's counsel then indicated that he would discuss the issue with her. Thereafter a recess was taken. Elaine does not claim that her attorney did not inform her that the questioning was going to take place.

to request attendance at the juror questioning constitutes a waiver of any rights she had under Rule 43.  See id. at 529.

### ii. Right to a Public Trial

The Sixth Amendment provides a criminal defendant with a right to a public trial.  See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial.")  This court has explained that

> the purpose of the public trial protection is to "benefit . . . the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."

United States v. Scott, 564 F.3d 34, 38 (1st Cir. 2009) (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)).  A public trial also "encourages witnesses to come forward and discourages perjury." Waller, 467 U.S. at 46.

Elaine faults the trial judge for excluding the public from the questioning of the jurors, thereby implicating her right to a public trial.  However, none of the considerations underlying this constitutional right are present here.  The attendance of the public was not needed to ensure that Elaine was "fairly dealt with" or "not unjustly condemned" because the subject of the conference was not her - it was Vonkleist.  Id.  Further, we cannot glean how the presence of interested spectators would have impacted the jurors' "sense of their responsibility" to honestly answer the simple questions posed - what did you hear Vonkleist say and can

-46-

you disregard it? Id. The absence of any testimony and the brief, limited nature of the conference also renders the perjury and witness concerns inapposite. Further, it bears repeating that just because a judge converses with a juror ex parte, it does not mean that a constitutional violation has occurred in every instance. See Gagnon, 470 U.S. at 526.

We do not see a Sixth Amendment violation in the facts at hand and Elaine's attempt to convince us otherwise is not persuasive. The cases Elaine relies on involve public trial violations in the context of total or partial courtroom closures during trial or during initial voir dire of prospective jurors. We have neither instance here. Elaine points to no case, precedential or otherwise, that extends the Sixth Amendment public trial right to the in-chambers questioning of a juror, let alone to an in-chambers questioning where the sole subject is the potential treatment of a contemptuous witness. We need not determine whether the public trial right could ever extend in such circumstances, but simply "decline to recognize such a right on facts as uncompelling as these." Vázquez-Botet, 532 F.3d at 52 (declining to extend the public trial right to an offer-of proof hearing on the facts at hand). Elaine's public trial claim fails. This takes us to the end of the road on Elaine's claimed errors.

## CONCLUSION

After thorough consideration, we have found no merit in any of Edward's or Elaine's arguments. Their convictions are affirmed.